PINILISHALPERN, LLP
160 Morris Street
Morristown, NJ 07960
Tel: (973) 401-1111
Fax: (973) 401-1114
Attorney for Appellees, Sean Michael O'Brien & Nicole Marie O'Brien
File No. 11276

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| FREDERICK CLEVELAND AND CLEVELAND DEVELOPMENT LLC, | HON. GARRETT E. BROWN, JR. CASE NO. 10-03169 (GEB) |
| Appellants, | On Appeal from an Order of the United States Bankruptcy Court Entered by Hon. Raymond T. Lyons |
| v. | |
| SEAN MICHAEL O'BRIEN and NICOLE MARIE O'BRIEN, | Sat Below: Hon. Raymond T. Lyons Adversary No. 08-1676 (RTL) |
| Appellees, | Chapter 13 |

**BRIEF OF APPELLEES SEAN MICHAEL O'BRIEN AND NICOLE MARIE O'BRIEN**

Of Counsel and On the Brief:
Gabriel H. Halpern, Esq.

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 2

STATEMENT OF FACTS .................................................................................... 4

LEGAL ARGUMENT............................................................................................ 9

    POINT ONE

    THE BANKRUPTCY COURT DID NOT RELY ON THE TESTIMONY
    OF PLAINTIFFS' EXPERT EDWARD HANRATTY, ESQ. IN
    REACHING ITS DECISION ................................................................................ 9

    POINT TWO

    THE COURT BELOW PROPERTY FOUND THAT THE
    DEFENDANTS' VIOLATED THE CONSUMER FRAUD ACT AND
    AWARDED COUNSEL FEES PURSUANT TO THE ACT ......................................... 11

    POINT THREE

    THE EQUITABLE MORTGAGE DOCTRINE DICTATES THAT THE
    "SALE" OF THE HOME IN THIS MATTER BE TREATED AS A
    MORTGAGE AND NOT A SALE BECAUSE THE TRUE INTENT OF
    THE PARTIES TO THE TRANSACTION WAS TO SECURE A LOAN
    AND NOT TO TRANSFER INTEREST IN REAL PROPERTY .................................. 15

    POINT FOUR

    THE BANKRTUPCY COURT PROPERLY FOUND THAT
    APPELLANT/DEFENDANT VIOLATED THE FEDERAL TRUTH IN
    LENDING ACT ("TILA"), RESCINDED THE TRANSACTION AND
    AWARDED DAMAGES ........................................................................................ 17

    POINT FIVE

    THE BANKRUPTCY COURT PROPERLY FOUND THAT
    CLEVELAND VIOLATED THE HOME OWNERSHIP AND EQUITY
    PRACTICES ACT ("HOEPA") 15 USC 1639................................................... 21

    POINT SIX

    THE BANKRTUPCY COURT PROPERLY FOUND THAT THE
    TRANSACTION VIOLATES THE NEW JERSEY OME OWNERSHIP
    SECURTIY ACT, N.J.S.A. 46:10B-21, ET SEQ ("HOSA")............................... 23

i

POINT SEVEN

APPELLANT/DEFENDANT BREACHED HIS CONTRACT TO PAY
OFF THE BANKRUPTCY ................................................................................ 25

POINT EIGHT

THE BANKRTUPCY COURT PROPERLY FOUND THAT THE
O'BRIENS DID NOT ACT WITH UNCLEAN HANDS AND WAS
WITHIN ITS DISCRETION NOT TO APPLY THE EQUITABLE
DOCTRINE OF UNCLEAN HANDS ................................................................. 25

POINT NINE

THE BANKRTUPCY COURT PROPERLY AWARDED COUNSEL
FEES AND COSTS ............................................................................................. 29

POINT TEN

DEFENDANTS HAVE NOT ADDRESSED THE FINDINGS HOLDING
THEM LIABLE FOR COMMON LAW FRAUD AND BREACH OF
CONRACT AND THOSE FINDINGS MUST BE AFFIRMED ................................... 29

CONCLUSION ............................................................................................................ 29

# TABLE OF AUTHORITIES

<u>Page(s)</u>

**Cases**

Adams v. Plaza Finance Company, 168 F.3d 932 (7th Cir. 1999) ................................................18

Associates Home Equity Services, Inc., 343 N.J. Super. 254 (App. Div. 2001) .......................13

Baher Azmy & David Reiss, 2002, 35 Rutgers L.J. 645, 648-50 (2004) ..................................23

Barry v. Arrow Pontiac, Inc., 100 N.J. 57, 69 (1985)...................................................................11

Begala v. PNC Bank, Ohio, Nat'l Ass'n, 163 F.3d 948, 950 (6th Cir. 1998)..............................19

Brown v. Courtesy Consumer Discount Co., 134 B.R. 134, 143 (Bankr. E.D. Pa. 1991)............................................................................................................................18

Brown v. Grant Holding, L.L.C., 294 F.Supp. 2d 1090 (D. Minn. 2005) ...................................15

Brown v. Loveland, 678 P.2d 292 (Utah 1984) ...........................................................................15

Cox v. Sears Roebuck & Co., 138 N.J. 2 (1994) ........................................................................12

D'Agostino v, Maldonado, C-8409, Sup. Ct. Ch. Div. June 30, 2010 ........................................14

DeLaval Turbine, Inc. v. West India Indus., Inc., 502 F2d 259, 263-64 (3d Cir. 1974)..................................................................................................................................9

DeVita v. Laprete, 75 N.J. Eq. (Ch. 1909)..................................................................................26

Edwards v. Your Credit, Inc., 148 F.3d 427 (5th Cir. 1998) .........................................................18

Fenwick v. Kay American Jeep, Inc., 72 N.J. 376-77 (1977)......................................................11

Franchi v. Farmholme Inc., 191 Conn. 201, 464 A.2d 35 (1983)..............................................15

Gennari v. Weichert Co. Realtors, 148 N.J. 582, 604 (1997)......................................................11

Glasofer Motors v. Osterlund, Inc., 190 N.J. Super. 6 (App. Div. 1981)...................................26

Gutermuth v. Ropiecki, 159 N.J. Super. 139, 146-47 (Ch. 1977) ...............................................16

Henderson v. Sec. Mortg. & Fin. Co., 273 N.C. 253, 160 S.E.2d 39 (1968) .............................15

Heritage Bank, N.A. v. Ruh, 191 N.J. Super. 53, 69 (Ch. Div. 1983)........................................26

Heuer v. Heuer, 152 N.J. 226 (1998)................................................................27

Hruby v. Larsen, 2005 WL 1541030 (D. Minn. June 30, 2005)..................................15

Huffmaster v. Robinson, 221 N.J. Super. 315, 319, 534 A.2d
435 (Law Div. 1986)....................................................................................12

In re Mattera, 128 B.R. 107 (Bankr. E.D. Pa. 1991)..............................................18

In re New Valley Corp., 181 F.3d 517, 525 (3rd Cir. 1999).......................................25

James v. Ragin, 432 F.Supp. 887 (W.D.N.C. 1977)................................................17

James Talcott, Inc. v. Roto Am. Corp., 123 N.J. Super. 183 (Ch. Div. 1973) ...............17

Johnson v. Cherry, 726 S.W.2d (Tex. 1987) ......................................................15

Johnson v. McCrackin-Sturman Ford., Inc., 527 F.2d 257, 2622 (3rd Cir. 1975) ...........18

J.W. Pierson Co. v. Freeman, 113 N.J. Eq. 268 (E&A 1933).....................................16

Lee v. First Union National Bank, 402 N.J. Super. 346, 351 (App Div 2008)..................13

Leff v. EquiHome Mortgage Corp., 05-CV-3648.....................................................13

Lemelledo v. Beneficial Mgmt. Corp., 150 N.J. 255, 264 (1997)...............................13

Leon v. Rite Aid Corp., 340 N.J.  Super. 462 (App. Div. 2001) ...............................11

Lettenmaier v. Lube Connection, Inc., 162 N.J. 138-9 (1999)..................................12

Levy v. Butler, 93 Wash. App. 1001 (1998).........................................................15

London v. Gregory, 2001 WL 726940 (Mich. Ct. App. Feb. 23, 2001)..........................15

Long v. Storms, 622 P.2d 731 (Or. Ct. App. 1981)................................................15

Metcalf v. Bartrand, 491 P.2d 747 (Alaska 1971) .................................................15

Mortgage Electronic Registraton Systems, Inc. v. Wilson, et al., 2005
WL 128047 (N.J. Super. Ch. Dvi. 2005) ............................................................16

Meyers v, Clearview Dodge Sales, Inc., 384 F.Supp. 722, 728 (E.D.La. 1974) ..............18

Murphy v. Household Fin. Corp., 560 F.2d 206, 210 (6th Cir. 1977)...........................19

N.C. Freed Co., Inc. v. Bd. of Governors of the Federal Reserve Board.Reserve Sys.,
473 F.2d 1210, 1214 (2nd Cir. 1973)..................................................................................19

Nubeck v. Nubeck, 94 N.J. Eq. 167, 170 (E&A 1922)....................................................26

Perma Life Mufflers v. International Parts Corp., 392 U.S. 134 (1968) .......................27

Perry v. Queen, 2006 WL 481666 (M.D. Tenn. Feb. 27, 2006)....................................15

Precision Instr. Mfg. v. Auto Maint. Mac. Co., 324 U.S. 806, 815 (1945) ...................25

Redmond v. McClelland, 2000 Min. App. LEXIS 779 (Minn. Ct. App.
July 25, 2000)....................................................................................................................15

Rowland v. Haven Properties, L.L.C.,  2005 WL 1528264 (N.D. Ill. June 24, 2005 ................15

Rutherford Nat'l Bank v. H.R. Bogle & Co., 114 N.J. Eq. 571 (Ch. Div. 1933) ........................16

Scibek v, Longette, N.J. Super. 72, 77-78, 770 A.2d 1242 (App Div. 2001)...............................13

Skeer v. EMK Motors, Inc., 187 N.J. Super. 465, 471-73, 455
A.2d 508 (App. Div. 1982 ................................................................................................13

Sudderth v. Howard, 560 S.W.2d 511 (Tex. App. 177) .............................................................15

Swenson v. Mills, 198 Or. App. 236, 108 P.3d 77 (2005)..........................................................15

Thomas v. Myers-Dickson Furniture Co., 479 F2d 740,748 (5th Cir. 1973) ..............................19

Turner v. E-Z Check Cashing of Cookeville, TN, Inc., 35 F.Supp. 2d 1042,
1047 (M.D. Tenn. 1999) ....................................................................................................18

Umpqua Forest Ind. v. Neehan-Ore Land Co., 188 Or. 605, 217 P. 2d
219 (1950)..........................................................................................................................15

United States v. Local 560 Intl. Bhd. of Teamsters, 780 F.2d 267, 278
(3d Cir.1985)........................................................................................................................9

Untermann v. Untermann, 19 N.J. 507 (1955) ..........................................................................26

Voustin v. Louis, 85 N.J. 507 (1981)..........................................................................................26

Williams v. Chartwell Financial Services, 204 F.3d 748 (7th Cir. 2000)...................................17

Wilson v. Bel Fury Investments Group, L.L.C. 2006 WL 297440

(D. Neb. February 6, 2006) ..................................................................................................15

Wisser v. Kaufman Carpet Co., 188 N.J. Super. 574, 458 A.2d 119
(App Div. 1983) ..................................................................................................................12


**Statutes**

N.J.S.A. 46:10B-21 .............................................................................................................23

N.J.S.A. 46:10B-22 .............................................................................................................22

N.J.S.A. 46:10B-24 .............................................................................................................23

N.J.S.A. 46:10B-25 .............................................................................................................23

N.J.S.A. 46:10B-25(d) .........................................................................................................23

N.J.S.A. 46:10B-29(b)(1) .....................................................................................................24

N.J.S.A. 51:8-4 ...................................................................................................................12

N.J.S.A. 56:8-2 ...................................................................................................................11

12 C.F.R. §226 ...................................................................................................................19

12 C.F.R. §226.1(b) .............................................................................................................18

12 C.F.R. §226.23(a)(3) .......................................................................................................20

12 C.F.R. §226.31, 226.32,336.34 ........................................................................................22

12 C.F.R. §226.32 ...............................................................................................................22

12 C.F.R. §226.32(d)(1) .......................................................................................................22

12 C.F.R. §638(a)(3), (b)(2) ..................................................................................................18

12 C.F.R. §1635(a) ..............................................................................................................18

12 C.F.R. §1640(a) ..............................................................................................................18

15 U.S.C. §1601(a) ..............................................................................................................19

15 U.S.C. §1602(u) ..............................................................................................................20

15 U.S.C. §1604(a) ........................................................................19

15 U.S.C. §1602(u) ........................................................................19

15 U.S.C. §1635 ............................................................................19

15 U.S.C. §1635(a) ........................................................................19

15 U.S.C. §1639 ............................................................................21

15 U.S.C. §1639(h) ........................................................................21

15 U.S.C. §1639(a) ........................................................................21

15 U.S.C. §1639(c)-(j) ....................................................................22

15 U.S.C. §1639(e) ........................................................................22

15 U.S.C. §1640(1)(3) ....................................................................19

15 U.S.C. §1601(a) ........................................................................18

15 U.S.C. §1604(a) ........................................................................18

**Treatises**

1 Weinstein's, supra, §103.41(4)(a)..................................................9

Governor's Press Release for Assembly Bill No. 2402..........................13

National Consumer Law Center, The Cost of Credit: Regulation, Preemption,
and Industry Abuses §7.5.2 (3d ed. 2005 and Supp.) ...........................15

National Consumer Law Center, Truth in Lending §6.2.5. (5th ed. 2003 and Supp.) .................17

Rya W. Zobel, Moore's Federal Practice §61.06(2)(3d ed. 1998) ...............9

## PRELIMINARY STATEMENT

In this appeal Appellant/Defendant Frederick Cleveland attacks the uncontroverted factual findings of the Honorable Raymond T. Lyons, U.S. B. J.   Appellant does so even though none of the defendants testified at the trial of this matter. Indeed, the documents submitted in evidence were alone sufficient to find liability against the defendant.  And, if the documents were not sufficient, Plaintiff Sean O'Brien testified as to the transaction.  Yet defendant has the audacity to challenge the findings of the Bankruptcy Court.  Defendant also attacks the testimony of plaintiffs' expert.  However, in reaching his decision, Judge Lyons did not even consider or rely on the testimony of plaintiffs' expert, Ted Hanratty.  There was no need to, because the documents involving the underlying transaction were compelling by themselves.

This case involves a mortgage foreclosure rescue scam perpetrated by the Defendants Frederick Cleveland and Cleveland Development LLC, with the complicity and knowledge of their attorney William E. Gahwyler, Jr., Esq. upon Plaintiffs Sean O'Brien and Nicole O'Brien. As Mr. O'Brien testified, once his home was in the foreclosure process he was receiving 25-30 solicitations a day to refinance his home. (Tr. 87-20).[1]

The National Consumer Law Center has described a mortgage foreclosure rescue scam transaction as follows:

> These transactions work like this: the homeowner "sells" the title to the real estate to a buyer/lender and receives in exchange a lease on the same premises with an option to purchase.  The "rent" and repurchase arrangements cost the homeowner a great deal more than what he or she "sold" the property for, and the real character of the transaction is simply a loan with interest hidden in the lease and repurchase arrangements.  Courts have long been willing to look to determine whether this is really an equitable mortgage to which state lending laws (particularly usury laws) apply.  Where such transactions are really disguised loans, courts have also held that they were subject to Truth in Lending,

---

[1] "Tr." refers to the trial transcript No. 5 of Record on Appeal.  "P" refers to Plaintiffs exhibits in evidence, No.14 of Record on Appeal.  Gahwyler dep. refers to the deposition transcript of William Gahwyler, Esq. which was submitted as part of Plaintiffs' case in chief to the court in its entirety.

including the rescission provisions.   National Consumer Law Center, Truth in Lending, (5th ed. 2003 pages 45 to 46) (citations omitted).

The O'Briens desperate to keep their home were led down the garden path by Mr. Cleveland.  Cleveland promised to refinance their home and rescue them from foreclosure.  The transaction, however, evolved into a sale and leaseback transaction put together by the defendants.  And the problem with the transaction is that Mr. O'Brien was convinced to willingly go along with whatever Mr. Cleveland needed in order to save his house.  Indeed, Mr. O'Brien candidly stated he understood that he was selling his home for $550,000.00 and buying it back for $650,000.00—however, he did not know that his equity was being stripped out of his home at the time of the purported sale.  He also did not know that Cleveland was placing a $650,000.00 mortgage on his property.  The O'Briens had no idea that Mr. Cleveland would walk away from closing with more than $86,000.00 of their equity and that they would incur another $30,000.00 in closing costs which would end up as a lien on their home.  Even a relatively educated consumer, such as Mr. O'Brien was convinced that the rescue scam would work—and that is the essence of the problem.   In a civilized society we do not permit people to take advantage of people who are desperate.  Many states, including New Jersey prohibit price gouging when supplies are in short demand. Most states prohibit inflating the price of an electric generator during a hurricane—even if the consumer knowingly and willingly agrees to pay thousands of dollars more than the value of the generator.  After all—that consumer is desperate for electricity.  Similarly, New Jersey does not permit price gouging in times of gasoline shortages, even when consumers are willing to spend the extra money to put gasoline in their cars.  As a civilized society we have adopted laws designed to protect consumers from illegal mortgage rescue scams.

3

People who are facing financial hardship and whose homes are being foreclosed are vulnerable.  They are already in foreclosure and some have filed bankruptcy.  It is difficult, or impossible to obtain financing.  And, the vultures, like Mr. Cleveland know this.  They bet on the fact that the "Seller" will not be able to refinance and "buy-back" the house.  Moreover, at the time this transaction was consummated, real estate values were increasing, which provided Cleveland with an opportunity to not only strip the existing equity out of the home, but also to be the title holder of an appreciating asset.

## STATEMENT OF FACTS

Sean and Nicole O'Brien (the "O'Briens") reside at 261 Langeveld Drive, Freehold, New Jersey 07728 with their two sons, who were 11 and 12 years old at the time of this transaction (Tr. 67-1 to 8).  Mr. O'Brien had financial difficulties and had filed bankruptcy in 2003.  In 2006 his problems increased when he was laid off from his job  (Tr. 67-12).  The mortgage went into arrears by November 2006 (Tr. 67-18 )The O'Briens were facing the loss of their home as a result of a foreclosure. (Tr. 68).  The family home was scheduled for sheriff sale (Tr. 69-3).

The O'Briens attempted to sell the home and even had executed a contract to sell their home. (Tr. 93 and 94).  Unfortunately the deal fell through and the O'Briens attempted to refinance the home to get out of the foreclosure (Id.).

The O'Briens had arranged to refinance their home under conventional means with Top Dot Mortgage. (Tr.88-3).  However that refinance fell through at the very last minute. (Tr.88-10).  Desperate not to lose the home over their heads and over the heads of their two young

children, the O'Briens sought assistance to "save" their home.  The mortgage broker

recommended Defendant Cleveland. (Tr. 69-21).[2]

Frederick Cleveland, under the guise of Cleveland Development LLC (collectively

referred to as "Cleveland") promised the O'Briens a new mortgage loan in the amount of

$540,000 to secure their home from foreclosure so that the O'Briens could refinance their home

and pay of their mortgage. (P-1) (Tr. 70-4 to 14).  The O'Briens had already postponed the

sheriffs sale several times.  (Tr. 70-21) As the time for sheriff's sale neared, Cleveland backed

off the promise to provide financing and instead perpetrated an outright fraud, typical of a

mortgage foreclosure rescue scam.

Instead of providing financing, Cleveland convinced the O'Briens to sell their home to

Cleveland and then leased the home back with an option to purchase.  O'Brien testified that "I

never really saw the evolution of the change.  It was all just a process we were going through to

refinance and save the home".  (Tr. 71-7)  Cleveland told them "it's the same, you are going to

keep your house".  (Tr. 71-13).

As set forth in the Real Estate Purchase Agreement, Cleveland was to purchase the home

for $555,232.00 (P-2).  The O'Briens were to lease the home for the sum of $5,000 per month

and, had the option to buy back the home for $650,483.83 (P-3) (Tr. 73-5).  O'Brien believed

that if his bankruptcy was paid at closing he would have two years of clean credit. (Tr. 722).

---

[2] The O'Briens also received an offer from Mr. Cantwell (Tr. 121-1).  When O'Brien tried to
move forward with the Cantwell contract, Cleveland claimed to have filed documents which
would preclude the Cantwell closing [most likely a lis pendens].  The O'Briens believed they had
no choice but to proceed with the Cleveland deal because the sheriff's sale, which had been
adjourned several times, was looming. (Tr. 121-8).  Cleveland and Gahwyler used the
bankruptcy approval from the Cantwell deal to proceed forward and close the Cleveland sale and
lease back.  (Tr. 125-5).

However, instead of purchasing the home for $555,232.00 Cleveland fraudulently represented to the lender that the purchase price was $808,000.00. In accordance with the HUD Uniform Settlement Statement (P-6), Cleveland paid off approximately $520,000.00 in debt owed by the O'Briens. However, Cleveland obtained a mortgage in the principal amount of $646,400.00 and was able to steal the O'Briens' equity from their home. (See HUD P-6; Gahwyler Escrow disbursement P-7 wherein a check was issued for "proceeds" to Cleveland).

The O'Briens asked whether they needed an attorney to handle the closing. Cleveland assured them that they did not and advised that his attorney  William Gahwyler would handle everything. (Tr. 74-5; 154-21)  The O'Briens were referred to Cleveland's attorney, William E. Gahwyler, Jr. ("Gahwyler") who improperly handled both sides of this transaction. Indeed, Gahwyler charged both Cleveland and the O'Briens the sum of $900.00 each for closing (P-6). Gahwyler also provided them with advice during the closing with respect to paying off the bankruptcy trustee (Tr. 155-6).

The O'Briens expressed concern that they received money from the closing to pay off the balance owed to the trustee in order to close out their bankruptcy. (Tr. 75-3). The bankruptcy case may not have shown up on the title search but Mr. Obrien was insistent that the proceeds from the closing be paid. Cleveland agreed at the closing to pay off the money owed to the bankruptcy trustee and executed an addendum prepared by Mr. Gahwyler at the closing. (Tr. 75-13 to 24; P-4).

The HUD (P-6) which was prepared by Gahwyler is fraudulent. Gahwyler could not explain why the HUD shows a purchase price of $808,000 when the contract had a different amount. The O'Brien's were told that was how much their house appraised for so it was appropriate to list the number in the HUD (Tr. 77-6). Most of the document was not explained to

the O'Briens by Mr. Gahwyler (Tr. 77-6). Although the HUD shows cash to seller in the amount of $287,516.17, Gahwyler admitted in his deposition testimony that was submitted in Plaintiffs case in chief that there was in fact no cash to seller [the O'Briens] (Deposition at page 27, line 14).  The O'Briens verified that they did not receive this amount (Tr. 77-19)[3].  This is confirmed by Gahwyler's escrow account disbursement sheet (P-7).  Further, the HUD also indicates that there was cash from Cleveland at the closing in the amount of $187,978.91 (P-6). Gahwyler admitted he did not receive this money from Cleveland (Deposition at page 27-11).  This representation was likewise fraudulent as Cleveland did not show up to the closing with money. Instead, in accordance with Gahwyler's escrow account reconciliation, Cleveland actually walked away from the closing with a check in the amount of $84,539.19 (P-7).

Gahwyler did not explain that he had a conflict of interest in representing both sides nor did he obtain a written waiver from the O'Briens. (Deposition at page 29-19).  Gahwyler admits that the actual sales price was not $808,000 as represented on the HUD (Deposition at page 30-16).

Through this scam, Cleveland obtained a deed for the O'Briens home.  The deed itself misrepresents the purchase price (P-9).

On the date of closing, the O'Briens advised Cleveland that they needed the sum of $46,000 to pay off their Chapter 13 bankruptcy plan.  Accordingly, a rider was prepared by Gahwyler confirming that Cleveland would pay the $46,000 needed to pay off the bankruptcy plan (P-4).  Notwithstanding this express acknowledgement of the indebtedness, Cleveland

---

[3] Mr. O'Brien candidly testified that he only received $15,000; and that although he had previously signed a certification that he received no money at closing, he explained that his attorney asked him whether he had received $287,516.17 and he stated he had not.  He later learned that he did receive $15,000 which prepaid a lease for a car. (Tr. 77-19 to 78-8; 156-16).

7

absconded with the money and failed to pay the monies due which were necessary to satisfy the
Chapter 13 bankruptcy pending before this Court.

Some months after the closing the O'Briens learned that Cleveland had not paid off the
bankruptcy trustee (Tr. 81-15). Additionally, the O'Briens commenced paying more than the
$5,000 per month in lease payments. (Tr. 83-4)  From the prior July 2007 through October 2008,
the payments were $6,300.  Starting October 2008 the payments have been $6,800 (Tr. 83-12).

Further, this is not the first time that Cleveland engaged in such a transaction.
Specifically, Cleveland purchased the home of Louis Accerra using the same modus operandi.
See P-8 and P-10.

After a one day trial, and the submission of exhibits and the deposition transcript of
William Gahwyler, the Bankruptcy Court entered judgment in favor of plaintiffs for common
law fraud, consumer fraud, under the Federal Truth in Lending Act ("TILA") , The Home
Ownership Security Act ("HOSA"),  The New Jersey Homeowners Equity Protection Act
("HOEPA") and breach of contract.

The Court calculated damages as the difference between the new mortgage encumbering
the O'Briens' home and the amounts paid to or for the benefit of the O'Briens ($116,791.49;
Opinion page 11).  This amount was trebled under the New Jersey Consumer Fraud Act. The
Court also rescinded the deed under both common law fraud and TILA.  The Court also awarded
damages under TILA, HOSA and HOEPA.  After supplemental submissions, the Bankruptcy
Court awarded counsel fees but declined to award punitive damages based on Defendants'
inability to pay such an award.

Appellant has not challenged the findings of the Bankruptcy Court under common law fraud or breach of contract. Appellant has apparently only challenged the portions of the decision which provide for enhanced damages and counsel fees.

## LEGAL ARGUMENT

## POINT ONE

### THE BANKRUPTCY COURT DID NOT RELY ON THE TESTIMONY OF PLAINTIFFS' EXPERT EDWARD HANRATTY, ESQ. IN REACHING ITS DECISION.

In reaching its decision, the Bankruptcy Court did not rely on the testimony of Mr. Hanratty. Accordingly, Defendants entire argument regarding the testimony which was elicited is not relevant, and even if Judge Lyons did rely upon such testimony, it would constitute harmless error.

It is well settled that in a nonjury case, an appellate court will not reverse on the basis of an erroneous admission of evidence unless (1) there is insufficient evidence other than the challenged evidence to support the district court's conclusion, or (2) the district court is induced by the challenged evidence to make an essential finding that it would not have made otherwise. United States v. Local 560, Intl. Bhd. of Teamsters, 780 F.2d 267, 278 (3d Cir.1985) (quoting De Laval Turbine, Inc. v. West India Indus., Inc., 502 F.2d 259, 263-64 (3d Cir.1974 ); *accord 12 Rya W. Zobel, Moore's Federal Practice* § 61.06(2) (3d ed.1998). This is a sensible rule based on the assumption that judges are more capable of ignoring prejudicial or irrelevant evidence than juries. See 1 *Weinstein's, supra,* § 103.41(4)(a) ("At one end of the scale is the nonjury trial in which the judge is often assumed, even in a criminal case, to have disregarded inadmissible evidence in arriving at a decision.").

In this case, while the Court admitted Mr. Hanratty's testimony, the Bankruptcy Court did not rely upon the testimony in reaching its decision. Specifically, in its written opinion the Bankruptcy Court stated:

> Plaintiffs called an attorney as an expert witness regarding the alleged malpractice by Mr. Gahwyler and to explain mortgage foreclosure rescue scams. Defendants objected to the expert's testifying on a variety of grounds, including bias since he represented another party suing the same defendants in state court. **The court permitted the testimony, but after hearing it determined that the expert's opinions will not assist the court as the trier of facts. Therefore the court has disregarded the expert's testimony.** (Opinion at page 9).

Indeed, during Mr. Hanratty's testimony the court questioned the utility of Mr. Hanratty on numerous occasions. Specifically, the Court made the following comments:

- Why do I need an expert to testify to that (Tr. 30-22)
- So, I'm not sure what Mr. Hanratty can add as a factual matter to the proceedings here. (Tr. 31-15)
- I haven't learned a lot from Mr. Hanratty so far. . . So I haven't learned a lot from Mr. Hanratty so far that I couldn't just deduce myself from the facts as presented (Tr. 56-2 and 56-14)

Further, the Court's opinion relies solely on the documents submitted in evidence and the testimony of Mr. O'Brien (and the deposition transcript of Mr. Gahwyler which was also admitted into evidence.)

Further, as set forth in the points below, the documents submitted into evidence and the testimony of Mr. O'Brien would alone have been sufficient to support a verdict. Accordingly this Court should affirm the judgment entered by the Bankruptcy Court.

POINT TWO

**THE COURT BELOW PROPERLY FOUND THAT THE DEFENDANTS' VIOLATED THE CONSUMER FRAUD ACT AND AWARDED COUSEL FEES PURSUANT TO THE ACT.**

The New Jersey Consumer Fraud Act (the "Act") was enacted to protect consumers from improper selling practices by "prevent[ing] deception, fraud or falsity, whether by acts of commission or omission, in connection with the sale and advertisement of merchandise and real estate." Fenwick v. Kay American Jeep, Inc., 72 N.J. 376-77 (1977). The Act is remedial and is to be liberally construed in favor of protecting consumers. Barry v. Arrow Pontiac, Inc., 100 N.J. 57, 69 (1985).

The "history of the Act is one of constant expansion of consumer protection." Leon v. Rite Aid Corp., 340 N.J. Super. 462, (App. Div. 2001) (quoting Gennari v. Weichert Co. Realtors, 148 N.J. 582, 604 (1997).

In pertinent part, the Act proscribes:

> The act, use or employment by any person of unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission in connection with the sale or advertisement of any merchandise . . . whether or not any person has in fact been misled, deceived or damaged thereby. N.J.S.A. 56:8-2

In interpreting the Act, our Supreme Court has held that "[t]he capacity to mislead is the prime ingredient of deception or an unconscionable commercial practice. Intent is not an essential element." Fenwick, 72 N.J. at 378. Under the Act, the use, *inter alia*, of any unconscionable commercial practice, deception or misrepresentation is an "unlawful practice." Such "unlawful practices" can take the form of either an affirmative act or an omission. N.J.S.A. 56:8-2  Also, included within the ambit of unlawful activity is the violation of any regulation

11

promulgated pursuant to Section 4 of the Act. N.J.S.A. 51:8-4; *See* Cox v. Sears Roebuck & Co., 138 N.J. 2 (1994).

In 1971 the Legislature amended the Act to 'give New Jersey one of the strongest consumer protection laws in the nation.'" Cox v. Sears Roebuck & Co., 138 N.J. 2, 14 (1994)(quoting the Governor's Press Release for Assembly Bill No. 2402).   The Legislature accomplished this objective by expanding "the definition of 'unlawful practice' to include 'unconscionable commercial practices'" and by broadening enforcement provisions to permit "any person who suffers any ascertainable loss of moneys or property as a result of the use or employment" of a practice declared unlawful under the Act, to assert a private right of action. **The Legislature's strengthening of the Act in 1971 also made mandatory an award of reasonable attorneys' fees,** and costs of suit for a successful plaintiff bringing a private right of action under the Act.  Id.; Lettenmaier v. Lube Connection, Inc., 162 N.J. at 138-9 (1999); N.J.S.A. 56:8-19.   Further there is no relation between the amount of recovery, if any and the amount of attorney's fees. ). *See  Huffmaster v. Robinson,* 221 *N.J. Super.* 315, 319, 534 *A.*2d 435 (Law Div.1986) ("assessment of treble damages and attorney's fees is mandatory when a violation of the Consumer Fraud Act has been proved."); *Wisser v. Kaufman Carpet Co.,* 188 *N.J. Super.* 574, 458 *A.*2d 119 (App.Div.1983) ("appropriate attorney's fees under the [Consumer Fraud] Act may be allowed without regard to the amount involved in the underlying dispute.")

The creation of a private right of action for a violation of the CFA, including a mandatory award of reasonable attorneys' fees and costs for a successful plaintiff, was a legislative recognition that the Division of Consumer Affairs cannot independently protect the marketplace from consumer fraud.  Thus, the Legislature created and employed the "private attorney general" to assist the Division of Consumer Affairs.

As then Governor Cahill explained, the private attorney general "reduces the burdens on the Division of Consumer Affairs." Governor's Press Release for Assembly Bill, No. 2402, at 2 (Apr. 19, 1971). See also <u>Skeer v. EMK Motors, Inc., 187 N.J. Super. 465, 471-73, 455 A.2d 508 (App. Div. 1982)</u> (examining legislative history of Act).   As this Court has explained, by reducing the burdens on the Division of Consumer Affairs through the creation of the private attorney general, the Legislature was able to accomplish the goal of, "creat[ing] an efficient mechanism to: (1) compensate the victim for his or her actual loss; (2) punish the wrongdoer through the award of treble damages; and (3) attract competent counsel to counteract the 'community scourge' of fraud by providing an incentive for an attorney to take a case involving a minor loss to the individual." <u>Lettenmaier v. Lube Connection, Inc., 162 N.J. 134, 139, 741 A.2d 591 (1999)</u> (citations omitted). See also <u>Scibek v. Longette, 339 N.J. Super. 72, 77-78, 770 A.2d 1242 (App. Div. 2001)</u> (examining purposes of Act).

In this case, Plaintiffs are consumers of credit.  Our courts have consistently "construed the CFA to protect customers against deceptions in the financial industry, including those pertaining to loans and consumer credit." <u>Lee v. First Union National Bank</u>, 402 N.J. Super. 346, 351 (App. Div. 2008).  See also, <u>Lemelledo v. Beneficial Mgmt. Corp., 150 N.J. 255, 264 (1997)</u> ("The language of the CFA evinces a clear legislative intent that its provisions be applied broadly [to consumer purchase of financial services contract] in order to accomplish its remedial purpose, namely, to root out consumer fraud"); <u>Associates Home Equity Services, Inc., 343 N.J. Super. 254 (App. Div. 2001)</u> (Predatory lending services can constitute violation of CFA).

Recently the U.S. District Court entered a judgment under the CFA against a mortgage company for providing an unsuitable loan to an 82 year old homeowner. <u>Leff v. EquiHome</u>

13

Mortgage Corp. 05-CV-3648. (owner refinanced where plaintiff only received $965 monthly from social security). Plaintiff received treble damages and legal fees.

Moreover, in a recent decision, the New Jersey Chancery Court adopted the very reasoning as that of the Bankruptcy Court in applying the CFA to a mortgage foreclosure rescue scam similar to the one involved in this case. See, D'Agostino v Maldonado, C-84-09, Superior Court Chancery Division June 30, 2010. ( A copy is submitted herewith).

In the instant case, the entire transaction was unconscionable. Defendant did nothing more than steal the equity out of the O'Briens' home, failed to pay off the bankruptcy trustee, and charged plaintiffs between $5,000 to $6800 a month to live in their home. Defendants knew the precarious financial situation of the O'Briens. Cleveland knew that they had poor credit and that they could not get financing. Further, it was likely, based on their financial condition that the O'Briens would be unlikely to ever obtain financing to buy the house back for an additional $100,000 from Cleveland and Cleveland would eventually become the owner of the house thereby stripping the balance of their equity. Moreover, Cleveland encumbered the house with a $650,000 mortgage—for the sole purpose of stealing the equity out of the house.

O'Brien did not know how Cleveland had come up with the $650,000 buy back price. However, he subsequently figured out that was the amount of the mortgage that Cleveland placed on his house. (Tr. 158-6).

Cleveland promised to provide financing to the O'Briens. Instead, the transaction morphed into an illegal sale and leaseback. Cleveland misrepresented what he was going to do. And, it is not whether the O'Briens were mislead, but the capacity to mislead which is paramount. Here, the O'Briens were promised one thing. Instead, the equity was stripped from their home.

It is clear that the Appellant engaged in unconscionable commercial conduct and the

Bankruptcy Court properly entered a judgment under the CFA. Having done so, the award of

counsel fees was proper.

Based on the foregoing, this Court should affirm the judgment of the Bankruptcy Court.

## POINT THREE

**THE EQUITABLE MORTGAGE DOCTRINE DICTATES THAT THE "SALE" OF THE HOME IN THIS MATTER BE TREATED AS A MORTGAGE AND NOT A SALE BECAUSE THE TRUE INTENT OF THE PARTIES WAS TO SECURE A LOAN AND NOT TO TRANSFER INTEREST IN REAL PROPERTY.**

Pursuant to the common law "equitable mortgage doctrine," many courts have recognized

that "sales" with repurchase options may in fact be loans, and that the deeds at issue in such

cases should be construed as equitable mortgages[4]. New Jersey has long recognized the

---

[4] See, e.g., Perry v. Queen, 2006 WL 481666 (M.D. Tenn. Feb. 27, 2006) (transfer of home created an equitable mortgage where the consumer was unsophisticated and not represented by counsel, where the payment made by the "purchaser" was only 10% of the fair market value of the home, and where the mortgage remained in the consumer's name); Wilson v. Bel Fury Investments Group, L.L.C., 2006 WL 297440 (D. Neb. Feb. 6, 2006) (court recognizes equitable mortgage doctrine but denies summary judgment to both sides due to disputes of material fact); Brown v. Grant Holding, L.L.C., 394 F. Supp. 2d 1090 (D. Minn. 2005) (court could not resolve whether the transaction constituted an equitable mortgage at the summary judgment stage; court evaluated six factors to determine the existence of an equitable mortgage; court also held that the landlord-tenant eviction judgment was not *res judicata* nor did the Rooker-Feldman doctrine apply; fraud counterclaim against the consumer based upon her alleged statement that she could make the rental payments was dismissed); Rowland v. Haven Properties, L.L.C., 2005 WL 1528264 (N.D. Ill. June 24, 2005) (court refuses to dismiss the equitable mortgage claim where a house worth $245,000 was deeded away for only $91,500 and where the homeowner alleged fraud and no intent to sell); Rowland v. Haven Properties, L.L.C., 2005 WL 2989901 (N.D. Ill Aug. 11, 2005) (court did not grant a preliminary injunction to the plaintiff to protect the *status quo* until a trial due to factual disputes; court list factors to consider in determining whether the transaction constituted an equitable mortgage); Hruby v. Larsen, 2005 WL 1541030 (D. Minn. June 30, 2005) (granting preliminary injunction to maintain *status quo*; court reviewed elements to prove an equitable mortgage and found that the consumers have a likelihood of success on the merits; court ordered a bond of $1000 plus monthly payments of $500); Metcalf v. Bartrand, 491 P. 2d 747 (Alaska 1971); London v. Gregory, 2001 WL 726940 (Mich. Ct. App. Feb 23, 2001) Redmond v. McClelland, 2000 Minn. App. LEXIS 779 (Minn. Ct. App. July 25, 2000) (deeds created equitable mortgage even without explicit option to purchase, in light of parties' intent and their relative sophistication); Henderson v. Sec. Mortg. & Fin. Co., 273 N.C. 253, 160 S.E.2d 39 (1968); Umpqua Forest Ind. v. Neenah-Ore Land Co., 188 Or. 605, 217 P. 2d 219 (1950); Swenson v. Mills, 198 Or. App. 236, 108 P.3d 77 (2005); Long v. Storms, 622 P.2d 731 (Or. Ct. App. 1981); Johnson v. Cherry, 726 S.W.2d 4 (Tex. 1987); Sudderth v. Howard, 560 S.W.2d 511 (Tex. App. 1977); Bown v. Loveland, 678 P.2d 292 (Utah 1984) (sale with oral repurchase option construed as equitable mortgage); Levy v. Butler, 93 Wash. App. 1001 (1998) (sale with repurchase option coupled with inadequate consideration sufficient to overcome presumption of sale transaction); National Consumer Law Center, The Cost of Credit: Regulation, Preemption, and Industry Abuses § 7.5.2. (3d ed. 2005 and Supp.). But see Franchi v. Farmholme Inc., 191 Conn. 201, 464 A.2d 35 (1983) (sale and leaseback not an equitable mortgage).

equitable mortgage doctrine and New Jersey Courts have frequently fashioned equitable

remedies based upon the equitable mortgage doctrine.  These sort of cases are relatively common

in foreclosure rescue scams such as the case at bar.

Our courts have recognized that sales with repurchase options, which include a lease back

to the original homeowner, are often thinly disguised loan, which are structured to avoid various

consumer regulations and disclosures.  The National Consumer Law Center has described the

transaction as follows:

> These transactions work like this: the homeowner "sells" the title to the real estate to a
> buyer/lender and receives in exchange a lease on the same premises with an option to
> purchase.  The "rent" and repurchase arrangements cost the homeowner a great deal more
> than what he or she "sold" the property for, and the real character of the transaction is
> simply a loan with interest hidden in the lease and repurchase arrangements.  Courts have
> long been willing to look to determine whether this is really an equitable mortgage to
> which state lending laws (particularly usury laws) apply.  Where such transactions are
> really disguised loans, courts have also held that they were subject to Truth in Lending,
> including the rescission provisions.  National Consumer Law Center, Truth in Lending,
> (5th ed. 2003 pages 45 to 46) (citations omitted).

Recently, one New Jersey Court held that "the way in which the parties agreed to create a

mortgage does not matter.  So long as the parties intended to secure a debt by a certain piece of

property, an equitable mortgage will have been created.  Express words are not required to create

an equitable mortgage so long as the intention to create such a lien is evident."  Mortgage

Electronic Registration Systems, Inc. v. Wilson, et al, 2005 WL 128047 (N.J. Super. Ch Div.

2005).  See also, J.W. Pierson Co. v. Freeman, 113 N.J. Eq. 268 (E & A 1933) ("If a transaction

resolves itself into an security, whatever may be its form and whatever name the parties choose

to give to it, it is, in equity, a mortgage"); Rutherford Nat'l Bank v. H.R. Bogle & Co., 114 N.J.

Eq. 571 (Ch.1933); Gutermuth v. Ropiecki, 159 N.J. Super. 139, 146-47 (Ch 1977) ("[t]he form

an agreement shall take in order to create an equitable lien is quite immaterial, for equity looks at

the final intent and purpose rather than at the form"); <u>James Talcott, Inc. v. Roto Am. Corp.</u>, 123 NJ Super 183 (Ch. Div. 1973) ("So long as the parties intended to secure a debt by a certain piece of property, an equitable mortgage will have been created.")

In the case at bar, the stated intent of the parties was to "save" the O'Briens' home through a refinanicng. (P-1.  The O'Briens went to Cleveland expressly for the purpose of obtaining a mortgage so as to "save" their home from foreclosure.  Because Cleveland claimed not to have been able to help the O'Briens get a traditional mortgage so as to refinance their existing mortgage encumbering their  home (which mortgage had by then been in foreclosure), the O'Briens entered into what essentially amounts to a mortgage – except instead of filing a security interest in the form of a mortgage with the County Clerk, Cleveland took a deed on the Home.  If ever there was a transaction that called for equitable principles to be applied, and the imposition of an equitable mortgage, this is the case.  Cleveland did not testify.  Accordingly there is no evidence which contradicts Mr. O'Brien's testimony that the transaction was meant to refinance the mortgage allowing the O'Briens to keep their home.

Accordingly, this Court should affirm the decision of the Bankruptcy Court.

## POINT FOUR

### THE BANKRUPTCY COURT PROPERLY FOUND THAT APPELLANT/DEFENDANT VIOLATED THE FEDERAL TRUTH IN LENDING ACT (TILA"), RESCINDED THE <u>TRANSACTION AND AWARDED DAMAGES.</u>

When a sale/leaseback is found to be a disguised loan, it is subject to federal loan disclosure requirements. TILA provides remedies in regard to equitable loans to the same extent as an explicit and written secured loan transaction. See, e.g., <u>Wilson v. Bel Fury Inv. Group,</u> 2006 WL 297440 at *5 (D Neb. Feb. 6, 2006) (No. 8:04CV640); <u>James v. Ragin</u>, 432 F. Supp. 887 (W.D.N.C. 1977); <u>Long v. Storms</u>, 622 P.2d 731 (Or. 1981) (transaction whereby investor

took a deed in exchange for a loan with a repurchase option was an equitable mortgage, or a loan

with a security interest; investor found to be creditor subject to TILA and homeowner was

entitled to rescind because Truth in Lending disclosures were not made); National Consumer

Law Center, Truth in Lending § 6.2.5. (5th ed. 2003 and Supp.); see also In re Mattera, 128 B.R.

107 (Bankr. E.D. Pa. 1991).

In this case, there was a loan transaction that was disguised as a sale.  Appellant, -- the

"lender" -- did not make any of the mandated loan disclosures called for by TILA.  Accordingly,

the transaction was properly rescinded by the Bankruptcy Court.

Courts have traditionally looked to the nature of a transaction, and have held that

substance, not form, will dictate whether or not TILA applies.  Turner v. E-Z Check Cashing of

Cookeville, TN, INC., 35 F.Supp.2d 1042, 1047 (M.D. Tenn. 1999) (citing Meyers v. Clearview

Dodge Sales, Inc., 384 F.Supp. 722, 728 (E.D.La. 1974), *aff'd in part, rev'd in part,* 539 F.2d

511 (5th Cir. 1976), *cert. denied,* 431 U.S. 929, 97 S. Ct. 2633, 53 L.Ed.2d 245 (1977)).  See also,

Williams v. Chartwell Financial Services, 204 F.3d 748 (7th Cir. 2000); Adams v. Plaza Finance

Company, 168 F.3d 932 (7th Cir. 1999); Edwards v. Your Credit, Inc., 148 F.3d 427 (5th Cir.

1998).

"Because of the fertility of the minds of those who would devise schemes to circumvent

remedial consumer protection laws, these laws must be interpreted with flexibility necessary to

preserve their spirit." Brown v. Courtesy Consumer Discount Co., 134 B.R. 134, 143 (Bankr.

E.D. Pa. 1991). "Because TILA is a remedial act designed to protect consumers, courts construe

it liberally in favor of consumers." Turner v. E-Z Check Cashing of Cookeville, TN, INC., 35

F.Supp.2d 1042, 1047 (M.D. Tenn. 1999) (citing Johnson v. McCrackin-Sturman Ford, Inc., 527

F.2d 257, 2622 (3rd Cir. 1975); Thomas v. Myers-Dickson Furniture Co., 479 F.2d 740, 748 (5th Cir. 1973)).

One of the primary purposes of the TILA is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a).  15 U.S.C. § 1604(a) enables the Federal Reserve Board to carry out the purposes of the TILA through regulations.  To that end, the Federal Reserve Board promulgated Regulation Z, 12 C.F.R. § 226, "to promote the informed use of consumer credit by requiring disclosures about its terms and costs." 12 C.F.R. § 226.1(b).  Prior to extending credit to a consumer in a residential transaction, among the items a creditor must disclose are the consumer's right to cancel and the estimated finance charge the creditor will impose.  15 U.S.C. §§ 1635(a), 1638(a) (3), (b) (2).  A creditor who fails to make the required disclosures is liable to the consumer for loan rescission, damages, costs, and attorney fees. 15 U.S.C. § 1635, 1640(a).

As a remedial statute, TILA's terms must be liberally construed in favor of consumers. See Begala v. PNC Bank, Ohio, Nat'l Ass'n, 163 F.3d 948, 950 (6th Cir.1998); Murphy v. Household Fin. Corp., 560 F.2d 206, 210 (6th Cir.1977); see also N.C. Freed Co., Inc. v. Bd. of Governors of the Federal Reserve Board. Reserve Sys., 473 F.2d 1210, 1214 (2nd Cir.1973) ("The Act is remedial in nature, designed to remedy what Congressional hearings revealed to be unscrupulous and predatory creditor practices throughout the nation.") (Footnote and citations omitted).

TILA (and the regulations promulgated by the Federal Reserve thereunder) gives consumers three days from the delivery of the notice of right to rescind or delivery of all material disclosures, whichever occurs last, to rescind a transaction.  12 C.F.R. § 226.23(a) (3).  If,

however, the notice or material disclosures are not delivered, the consumer has three years from the date the transaction was consummated to rescind. Id. Material disclosures means "the disclosure ... of the annual percentage rate, the method of determining the finance charge and the balance upon which a finance charge will be imposed, the amount of the finance charge, the amount to be financed, the total of payments, the number and amount of payments, [and] the due dates or periods of payments scheduled to repay the indebtedness." 15 U.S.C. § 1602(u); 12 C.F.R. § 226.23(a) (3) n. 48.

Cleveland had previously done the same thing on another transaction-the Aceras. Therefore Cleveland is a creditor as defined by TILA.

In this case, it was admitted that no disclosures were provided to the O'Briens with regard to the cost of the credit they were getting from Cleveland. This is particularly true with respect to the cost of the "option" to buy back their home from Cleveland. Clearly the "option" was nothing more than a balloon interest payment for the loan that was given the O'Briens so as to "save" their home.

The transaction involved a loan of $555,232.00 on the O'Briens' home. In order to payoff that loan and remain in their home, the O'Briens had to repay the $555,232.00 plus $95,251.83 in "balloon interest" exercisable at any time during two years. In addition, the O'Briens were required to pay $5,000 per month under a Lease and Buyback Agreement. Thus, if the O'Briens repurchased their property in one month they would have paid $105,251.83 in interest on the $555,232.00. This payment alone (without including finance charges in the actual loan transaction) equate to an annual interest rate of 227%.

The Court Bankruptcy Court however performed its own calculation and determined that the APR of the transaction was at the very least 20% at the time the treasury yield was only

20

4.75% (See Opinion at 24).  Twenty percent exceeds by more than 10 percentage points the yield on Treasury securities and therefore this loan constituted a high interest loan subject to TILA. (Opinion at 24-25).  That cost of credit was never disclosed to the O'Briens.  Accordingly, the Bankruptcy Court properly awarded damages and counsel fees under TILA.

In this case, there was more than an understatement of the finance charge - - there was a complete and utter disguise for the finance charge such that the transaction would not be recognizable as a loan and the finance charge would seem to be something other than a finance charge.  The Bankruptcy Court properly found that Defendant violated TILA and rescinded the transaction and awarded damages consisting of the finance charges and fees, statutory damages and counsel fees under 15 U.S.C. 1640(a) (1)-(3) of TILA.

## POINT FIVE

## THE BANKRUPTCY COURT PROPERLY FOUND THAT CLEVELAND VIOLATED THE HOME OWNERSHIP AND EQUITY PRACTICES ACT ("HOEPA") 15 USC 1639.

In 1994 Congress passed high-rate home-equity loan protections designed to prevent predatory lending practices targeted at vulnerable consumers.  Additional protections are afforded to consumers if the loan has a high annual percentage rate.  The rate is established at 8% higher than the five-year treasury note.  If the rate exceeds the floor, the consumer is entitled to certain additional disclosures, including the right to rescind in three days in advance of the closing and a warning of the risks of entering into a high interest loan.  If the right to rescind is not provided, the right to rescind can be extended up to three years.  Regulation Z Section 226.32.  HOEPA also prohibits a lender from making a loan without regard to the consumers' ability to repay the loan 15 USC 1639(h).  A violation of HOEPA allows the consumer to rescind the transaction, to seek enhanced damages, statutory damages and counsel fees. Id.

21

Defendant Cleveland is a creditor under TILA and was therefore required to make the traditional TILA disclosures.  Furthermore, because the Defendant is a creditor pursuant to Section 1062(aa), he is also required to make the enhanced disclosures required by the Home Ownership and Equity Protection Act ("HOEPA").  A creditor is defined as a person who has engaged in two or more transactions. 1602 (F) Reg. Z 226.2.n.3.  (See Opinion at 24 determining the APR to be a minimum of 20% and the treasury rate to be 4.75%)  15 U.S.C. §1639 (added to TILA in 1994); *see also* 12 C.F.R. §§226.31, 226.32, 336.34 (incorporating HOEPA into Regulation Z).  The uncontroverted testimony is that the O'Briens did not receive any TILA or HOEPA disclosures and the Appellant/Defendant conceded this fact.

HOEPA also lists several prohibited terms and "[a]ny mortgage that contains a provision prohibited by [Section 1639] shall be deemed a failure to deliver the material disclosures required . . . . "  15 U.S.C. §1639(c)-(j); *see also* 12 C.F.R. §226.32.  Balloon payments on mortgages of less than five years are prohibited. 15 U.S.C. §1639(e); 12 C.F.R. §226.32(d)(1).  A balloon payment exists when the regular payments do not fully amortize the outstanding principal balance.  *Id*.  The repayment structure set forth by the Lease Buyback Agreement gives rise to a balloon interest payment and therefore the terms is among those prohibited by HOEPA.

None of the disclosures required by TILA and HOEPA were made to the O'Briens by Appellant/Defendant or anyone else.  Appellant/Defendant, being a creditor under TILA and HOEPA, was required to provide the disclosures.  Appellant/Defendant was also required to comply with TILA and HOEPA's prohibition of terms, which he did not.

As previously set forth, this transaction has a potential interest rate of 227% and a minimum of 20% APR.  The "rent" the O'Briens were paying was nothing more than a disguised finance charge.  The transaction therefore violates HOEPA,.  Under HOEPA the

22

O'Briens are entitled to their actual damages plus all finance charges and fees paid by the O'Briens. Accordingly the Bankruptcy Court properly awarded the O'Briens damages under HOEPA. HOEPA also provides for the award of counsel fees to a successful plaintiff.

## POINT SIX

### THE BANKRUPTCY COURT PROPERLY FOUND THAT THE TRANSACTION VIOLATES THE NEW JERSEY HOME OWNERSHIP SECURITY ACT, N.J.S.A. 46:10B-21, ET SEQ. ("HOSA").

The New Jersey Home Ownership Act of 2002 ("HOSA"), N.J.S.A. 46:10B-22, et seq., was adopted to address certain abusive mortgage lending practices. Baher Azmy & David Reiss, *Modeling a Response to Predatory Lending: The New Jersey Home Ownership Security Act of 2002*, 35 RUTGERS L.J. 645, 648-50 (2004).

HOSA, which is modeled after HOEPA affords New Jersey residents even broader protections than HOEPA. The rate caps are lower, and the advance disclosures that are required are more detailed, including the requirement that the homeowner being required to obtain credit counseling in advance of entering into the transaction. As set forth previously, the rate cap is 15.25% more than the treasury yield. (See Opinion at 24 determining the APR to be a minimum of 20% and the treasury rate to be 4.75%).

HOSA, as amended in 2004, regulates "homes loans" and "high-cost home loans." High-cost home loans are limited to those where the principal amount is less than $350,000, adjusted for inflation. N.J. S.A. 46:10B-24. HOSA prohibits certain practices for all home loans, such as financing credit insurance, encouraging default or charging excessive late fees. N.J. S.A. 46:10B-25. Late fees may not exceed 5% of the past due payment and may be imposed only if a payment is fifteen days or more past due. N.J. S.A. 46:10B-25(d).

23

The Lease Agreement Buyback permits Appellant/Defendant to assess a late fee if the $5,000 monthly payment is more than five days late at the rate of $10 per day. Thus, if a payment is more than twenty-five days past due, the late fee would exceed 5%. Both the five day period and the daily charge are prohibited by HOSA for any home loan.

Remedies for a material violation of HOSA include:

1.  Statutory damages equal to the finance charge plus up to 10% of the amount financed;

2.  Punitive damages; and

3.  Costs and attorney's fees.

N.J.S.A. 46:10B-29(b)(1).

The Bankruptcy Court properly found that the excessive late fees provided under the Lease Buyback Agreement constituted a material violation of HOSA and found that Plaintiffs were entitled to statutory damages equal to the finance charges..

In this case the Bankruptcy Court computed the finance charges as $240,875.32 – the sum of $5,000 per month for twenty-four months ($120,000) plus the difference between the repurchase price ($650,483.83) and the amount financed ($529,608.51), i.e., $120,875.32. In addition, statutory damages include 10% of the amount financed, i.e., $52,960.85. Accordingly, the Bankruptcy Court properly awarded statutory damages of $293,836.17 to the O'Briens under HOSA.

Further, HOSA allows for the award of counsel fees. Id. Accordingly, having found that there is a violation of HOSA, the Court properly awarded counsel fees.

24

## POINT SEVEN

### APPELLANT/DEFENDANT BREACHED HIS CONTRACT TO PAY OFF THE BANKRUPTCY.

Appellant/Defendant has not challenged the judgment based on breach of contract. Pursuant to the terms of the Rider to the contract dated July 30, 2007 (P-4), Appellant/Defendant agreed to pay any monies due to the bankruptcy court, up to the amount of amount of $46,000.00. It is undisputed that Cleveland failed to pay the amount after demanded or even after an application was made to the Bankruptcy Court seeking an order compelling same. The Bankruptcy Court properly found that Cleveland breached this contract.

## POINT EIGHT

### THE BANKRUPTCY COURT PROPERLY FOUND THAT THE O'BRIENS DID NOT ACT WITH UNCLEAN HANDS AND WAS WITHIN ITS DISCRETION NOT TO APPLY THE EQUITABLE DOCTRINE OF UNCLEAN HANDS.

The Supreme Court and the Third Circuit have held that it is not mandatory that a court apply the unclean hands doctrine. See In re New Valley Corp., 181 F.3rd 517, 525 (3rd Cir. 1999). Whether to apply the doctrine or not is within the sound discretion of the trial court. Id. See also, Precision Instr. Mfg. v. Auto Maint. Mac. Co., 324 U.S. 806, 815 (1945).

In the instant case, the Bankruptcy Court found that plaintiffs did not act with unclean hands. Specifically, the fact that the O'Briens may have failed to fully inform the Court that the transaction approved by the Bankruptcy Court fell through and that the O'Briens chose to go forward with a different transaction with Defendant was not the type of conduct which the Bankruptcy Court determined should preclude Plaintiffs from recovery. (Opinion at 20) Further, the Bankruptcy Court determined that the aforesaid was related to a different transaction and therefore not the subject of unclean hands. Id. at 20-21.

25

The maxim of unclean hands has its limitations. It does not banish all sinful suitors from a court of equity nor does it apply to unconscientious action or all inequitable conduct. Heritage Bank, N.A. v. Ruh, 191 N.J. Super. 53, 69(Ch. Div. 1983). The doctrine calls for the exercise of just discretion on the part of the Court. Untermann v. Untermann, 19 N.J. 507(1955). In order to apply the equitable of unclean hands, the wrongful conduct must have occurred in the particular matter to which judicial protection or redress is sought. Id.. A court of equity must administer equitable relief upon equitable terms and not as punishment. DeVita v. Laprete, 75 N.J. Eq. (Ch. 1909) affirmed 77 N.J. Eq. 533(E&A 1909). Further, the doctrine is only applicable if the conduct directly relates to the subject matter that is involved in the lawsuit. Voustin v. Louis, 85 N.J. 507 (1981). The doctrine of unclean hands is only applicable in the particular matter in which judicial protection or redress is sought. Nubeck v. Nubeck, 94 N.J. Eq. 167, 170 (E&A 1922). Similarly the doctrine does not apply if the moving party is violating the law. See Glasofer Motors v. Osterlund, Inc., 190 N.J. Super. 6 (App. Div. 1981). Our courts have leaned in favor of a allowing plaintiff to pursue his claims.

In Glasofer Motors v. Osterlund, Inc., 190 N.J. Super. 6 (App. Div. 1981) the Court refused to bar a plaintiff from asserting an action under the Sherman Antitrust Act and the New Jersey Antitrust Act, based upon plaintiff's fraudulent misrepresentations. In Glasofer, in connection with a public bid for the City of Newark, Glasofer had represented that it was an authorized dealer of Diamond Reo trucks. The trial court found that plaintiff Glasofer had willfully misrepresented itself as an authorized Diamond Reo dealer and that "plaintiff's willful misrepresentations constitute bad faith and shocks the Court's conscious". The trial judge therefore concluded that the doctrine of unclean hands barred plaintiff's action. However, the Appellate Division reversed holding that public policy should not allow the Defendants to

engage in illegal conduct violative of the Antitrust Act and therefore, allowed the plaintiff to pursue its claims.

The Appellate Division quoted the Supreme Court stating that "the plaintiff who reaps the reward of treble damages may be no less morally reprehensible that the defendant, but the law encourages his suit to further the overriding public policy in favor of competition. Id. citing Perma Life Mufflers v. International Parts Corp, 392 U.S. 134 (1968).  The Court also noted that the plaintiff could be held responsible in other proceedings brought by the government or parties injured.  Similarly in Heuer v. Heuer, 152 N.J. 226 (1998), the Court declined to apply the doctrine against the plaintiff-wife in a divorce action whose earlier foreign divorce decree had been fraudulently procured.

The instant case is analogous to Glasofer, supra.  In this case, defendants who have engaged in conduct which violates New Jersey State Common Law, violates the Federal Truth in Lending Act, the Homeownership Security Act and the Homeownership Equity Protection Act, seek to assert the doctrine of unclean hands to bar O'Briens claims. In Glasofer, plaintiff was allowed to proceed with a private right of action under the Sherman Anti-trust Act.  Similarly in this case, the O'Briens seeks to pursue their private right of action under the CFA, TILA, HOSA and HOEPA.  The same policy consideration which allowed Glasofer to pursue its claims are equally applicable to this case—to prosecute the Defendants in a private cause of action and not allow them defendants to strip the equity out of a consumer's home.

Further, the conduct about which the moving defendants complain have is the result of their own conduct.  In other words, they suggest because the O'Briens agreed to enter into the deal  defendants should be permitted to invoke the doctrine of unclean hands.  However, the doctrine of unclean hands, applies only to conduct against relating to the transaction, which is the

27

subject matter of the complaint.  As set forth in <u>Glasofer</u>, there are other ways of dealing with such conduct.

Further, the public policy of this state and the federal laws, should not allow defendants to "get away" with circumventing the CFA, and violating TILA.  There are strong consumer regulations and policy considerations, similar to those discussed in <u>Glasofer</u>.

If the Court were to take in the "totality of the circumstances" into account, the equities fall in favor of the O'Briens.  Any conduct of the O'Briens should be weighed against the ramifications of dismissing the claims against these defendants, who engaged in a transaction which stripped the O'Briens of the in equity from his home, which constituted an outright fraudulent real estate closing.

Appellant/Defendant engaged in the typical "mortgage foreclosure rescue scam". Appellant/Defendant was able to strip the O'Briens equity in their home by promising that he would refinance the home.  In order to induce the O'Briens to do so,  Appellant/Defendant provided them with a contract that would give them the right to repurchase their home for a substantially higher amount, in a short period of time.

The Bankruptcy Court properly refused to condone the actions of vultures like Cleveland, who prey on the financially strapped and desperate people.  Accordingly, the Bankruptcy Court properly refused to apply the doctrine of unclean hands to bar the claim of the O'Briens.

## POINT NINE

### THE BANKRUPTCY COURT PROPERLY AWARDED COUNSEL FEES AND COSTS.

As set forth above, the CFA, TILA, HOEPA and HOSA all provide for the award of counsel fees. Plaintiffs' counsel sought a multiplier of 1.5 times its lodestar based upon the results of the case, the complexity of the issues. However, the Bankruptcy Court awarded counsel fees only in the amount of the lodestar which was only Accordingly, the Bankruptcy Court having properly found liability under both the CFA and TILA properly awarded counsel fees.

## POINT TEN

### DEFENDANTS HAVE NOT ADDRESSED THE FINDINGS HOLDING THEM LIABLE FOR COMMON LAW FRAUD AND BREACH OF CONTRACT AND THOSE FINDINGS MUST BE AFFIRMED.

Appellant/Defendant has not briefed the issues relating to the finding of common law fraud or the ward based on breach of contract. Accordingly, those findings should be affirmed.

### CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that this Court affirm the decision of the Bankruptcy Court

PINILISHALPERN, LLP
Attorneys for Appellees
Sean and Nicole O'Brien


Dated: July 26, 2010                    By:/s/ Gabriel H. Halpern
                                           Gabriel H. Halpern, Esq.

NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE COMMITTEE ON OPINIONS

| | |
|---|---|
| ANTHONY D'AGOSTINO and DENISE D'AGOSTINO, <br>                 Plaintiffs, <br><br> v. <br><br> RICARDO MALDONADO, LUIS A. RAMOS, JOHN and JANE DOES 1-10 and XYZ COMPANIES 1-10, <br>                 Defendants. | **SUPERIOR COURT OF NEW JERSEY** <br> **CHANCERY DIVISION** <br>  **BERGEN COUNTY** <br><br><br><br> DOCKET NO. C-84-09 <br><br> CIVIL ACTION <br><br> OPINION |

**Trial:  April 12, 13, 14, 19, 20, 21, 26, 27, 28, and May 3, 4, 2010.**

**Decided: June 30, 2010.**

Thomas P. Monahan, Esq., for plaintiffs Anthony and Denise D'Agostino.

Stephen H. Roth, Esq., for defendant, Ricardo Maldonado.

**Koblitz, P.J. Ch.**

      This case involves an irregular mortgage rescue plan that went awry.  The plaintiffs, ex-husband Anthony D'Agostino ("Anthony") and ex-wife Denise D'Agostino ("Denise"), are a divorced couple who got mired in financial problems when Anthony lost his lucrative Wall Street job and their marriage subsequently fell apart.  Anthony inherited two multi-unit dwellings on one piece of Property at 37 Spring Street, Garfield, New Jersey ("the Property") with a total

1

of four or five apartments. The couple lived with their children in the second floor of the back house. Anthony "stepped out of his marriage" in 2005 to move in with his girlfriend in Cliffside Park, returning to the family abode from time to time to obtain clothes and see the children. He engaged in behavior towards his wife which resulted in a domestic violence final restraining order ("FRO") in September of 2007 which prevented him from returning to the marital home.

On May 22, 2006, Anthony signed a mortgage for $252,000 (which was never recorded) to pay off the outstanding balances of two 1998 mortgages, pay past-due real estate taxes and water charges of more than $21,000, and pay his credit card debts totaling $14,948. He walked away with $35,899 in cash. In March of 2007, he persuaded Denise to use her then superior credit rating to help him obtain a new mortgage in her name only for $325,000. In exchange for her agreement to do this, Denise received $10,000 towards her outstanding credit card obligations. Anthony walked away with another $32,000.

Denise obtained the FRO against Anthony on September 25, 2007. Anthony retaliated. He continued to collect the rents (about $2,900. per month) but stopped paying the new mortgage (and the utilities). In short order, the new mortgage went into default, then foreclosure (they were both served on October 20, 2007), and finally into default in the foreclosure action (on November 27, 2007). By December of 2007 the amount due on the mortgage had ballooned to $360,000.

In January of 2008, Anthony began to communicate with defendant Ricardo Maldonado ("Maldonado"). Maldonado was constantly on the road for his job at Sears. He placed a

2

magnetic advertisement reading "I buy houses"[1] on the side of his car. He did not advertise his availability for real estate dealings in any other way.

Determining what happened in this transaction is complicated by the credibility problems of the plaintiffs. Denise had a poor memory as to what documents she signed, how many times she signed documents and who was present during the signing. Her basic testimony was that, even though she was getting divorced and had an FRO against her husband, she signed any document Maldonado told her Anthony wanted her to sign. She believed her husband was taking care of the Property because she knew the Property was very important to him as it was inherited from his family and he wanted to maintain the Property for their children. She trusted his judgment to safeguard the Property.

Denise was a poor witness due to serious memory problems and an apparent lack of sophistication regarding financial dealings. She relied on her estranged husband to make financial decisions. She is a high school graduate working for Saint Mary's Cemetery (initially for her father, who is now retired). When this transaction occurred, she was going through a divorce and was the victim of domestic violence. She also was moving out of her extremely disheveled living space (with many messy animals and an overall deplorable level of cleanliness). Although understandable in light of her stressful situation, her memory problems were not helpful in determining the facts.

Anthony is a college graduate who worked on Wall Street for ten years beginning in 1990, earning as much as $250,000 a year. Recently he has worked as a security guard and a commission-only commodities salesman. He complained that his defense against an indictment for criminal weapons charges (stemming from a search pursuant to the domestic violence

---

[1] Maldonado's current sign reads "We buy houses," as he has since acquired a business partner. Additionally, his current sign now lists a website, in addition to his phone number, which was listed on the original sign.

restraining order) drained his financial resources and the charges prevented him from obtaining more lucrative employment. Anthony was an extremely non-responsive witness. He seemed totally unable to respond to a direct question, whether it was posed by his counsel, adversary counsel, or the Court. He cried several times during his testimony and generally bewailed his plight and that of his children.

Defendant Maldonado, age 42, completed only the ninth grade at Arts High School in Newark, yet he was by far the most cogent and informative witness in this trial. He has had various jobs: retail clothing; car sales; home improvement store sales; and financial services, first for the car dealership and then on his own, helping people improve their credit score. In 2008, as a product specialist managing 25 representatives and working 60 to 70 hours a week, Maldonado earned $113,000 working for Sears selling kitchen remodeling. As the top performing salesman he received a gold ring. Due to the economy and this litigation, he earned only $90,000 in that capacity in 2009.

He also has been involved in seven real estate transactions involving distressed properties over the past thirteen years. He looks for run-down, under-valued property where he can make modest improvements and sell at a profit. When necessary, he deals with mortgagees and lien holders to negotiate a more favorable result. Maldonado has been involved in the following transactions:

a) 1997 – Defendant purchased two boarded-up bank-owned properties in Union City, New Jersey, and resold them for a profit ($27,000 on one of the properties alone). Defendant negotiated with the bank directly;

b) 1998 – Defendant entered into a "flip" transaction with a vacant property in Roselle, New Jersey. Defendant obtained legal title to the property without the use of an attorney, and immediately conveyed title to a third party, having repaired the property before he purchased it;

4

c) 1999 – Defendant purchased a property in Newark, New Jersey, without an attorney by borrowing $130,000 from a friend, and then resold the property for a profit of approximately $50,000;

d) 1999 – Defendant purchased a property in Bloomfield, New Jersey, by entering into a "short-sale" transaction, without an attorney, whereby he directly negotiated with the lenders and other lien holders, providing an amount less than the total encumbrances on the property.  The owner had gambling problems and was in financial distress.  Defendant lived in this house and sold it five years later for $420,000.  Defendant profited approximately $290,000 on this transaction;

e) 2001/2002 – Defendant entered into another "flip" transaction, without an attorney, with a property in Garfield, New Jersey.  Once again, Defendant did not use his own funds or financing and immediately conveyed title to a third-party.  The property owners were getting a divorce and could not make their mortgage payments.  Each of the spouses received $10,000 form the deal.  Defendant profited approximately $70,000 on this transaction; and

f) 2005 – Defendant entered into a trust agreement, with attorneys involved, whereby he became trustee for a property located in Newark, New Jersey.  Defendant held the property as trustee, hired contractors and marketed the property for sale.  The owner was an ailing woman who lived with her drug-addicted daughter.  Defendant testified that he used the trust agreement in order to obtain control without triggering the "due-on-sale" clause.  Maldonado put none of his own money into the deal and obtained a profit at the closing.

Maldonado testified persuasively and answered questions responsively. Even plaintiffs' counsel relied in large measure on Maldonado's testimony to develop the facts of this case.

The notary public hired by Maldonado testified essentially in conformity with Maldonado's version of the facts. He did no more than notarize the signatures on the documents. The plaintiffs' two divorce attorneys also testified at trial indicating that the Property was viewed as a marital asset by the parties in their divorce litigation. In the divorce settlement they agreed to equally divide the Property or any other proceeds recovered in this litigation. Their testimony was not particularly useful, except perhaps to debunk defendant's theory that Anthony was

5

engaged in a scheme with Maldonado to deprive Denise of the Property by transferring the Property to Maldonado and then buying it back post-divorce to avoid equitable distribution.

To the extent that Anthony did initially formulate an intent to deprive Denise of her interest in the property by buying the Property back after the divorce to avoid equitable distribution, that initial motivation does not constitute sufficient bad behavior to evoke the application of the unclean hands doctrine as urged by the defendant. It is well settled that the "application of unclean hands rests within the sound discretion of the trial court." See O'Brien v. Cleveland, 423 B.R. 477, 492 (Bankr. D.N.J. 2010) (citing In re New Valley Corp., 181 F. 3d 517, 525 (3d Cir. 1999)). Nor do the purported exaggerations of financial resources used by the plaintiffs in documents submitted to other lenders rise to the level of "unconscionable conduct" customarily needed to trigger the application of the unclean hands doctrine. See O'Brien, 423 B.R. at 492.

At trial, Anthony requested that his share of any recovery be put into an escrow account to guarantee his child support responsibilities, to be used if he is unable to pay his court-ordered or agreed-upon child support or educational costs. This request will be implemented.

Essentially, the agreement between the parties here was

> a) Defendant would contact the lender to negotiate a halt to the foreclosure proceedings;
>
> b) Defendant would create a trust whereby he would manage the Property as trustee;
>
> c) Defendant's management duties enabled him to collect rents, make repairs and pay down the mortgage and Property taxes; and
>
> d) Plaintiffs would have one year to compensate Defendant for his services by repurchasing the Property for $400,000.

Maldonado anticipated reaping at least $40,000 in profit. He thought the rents would pay for the necessary repairs, especially since he would be able to rent out the back upstairs apartment once Denise and her children moved out. If the D'Agostinos did not buy back the Property, Maldonado would realize $120,000 in profit. The repairs, however, were more expensive and he had more difficulty obtaining rent from the units than he anticipated.

Maldonado drew up the following documents which he obtained over the internet:

      a)  Letter of Agreement (Exhibit P-8);

      b)  Agreement and Declaration of Trust (Exhibit P-11);

      c)  Warranty Deed to Trustee (Exhibit P-12);

      d)  Assignment of Beneficial Interest in Trust (Exhibit P-14); and

      e)  Option Agreement (Exhibit P-25).

Anthony and Denise signed the documents on January 17, 2008, without counsel. Defendant did not sign any of these documents. All signed copies of the documents were retained by Defendant. The Letter of Agreement stated that the mortgage on the Property contained a "due on sale" clause and acknowledged that the lender had the right to call the entire loan due upon transfer of title. The document did not require defendant to pay the loan from the rent proceeds from the Property. (See Exhibit P-8). The Agreement and Declaration of Trust operated to create a trust whereby defendant was the trustee, plaintiffs were the beneficiaries and the Property was the trust corpus. (See Exhibit P-11). The Warranty Deed to Trustee had the effect of transferring legal title to the Property from Anthony and Denise D'Agostino to defendant as trustee. At the time the Warranty Deed was executed, the Property was worth $480,000. At Trial, defendant acknowledged that the Property had at least $120,000 in equity at the time, and produced approximately $3,000 per month in rental income. The Assignment of

7

Beneficial Interest in Trust had the effect of transferring all of Anthony's and Denise's legal interest in the trust as beneficiaries to defendant. The Option Agreement provided a one year period in which plaintiffs could pay defendant $400,000 to regain title to the Property. This was done, although the mortgage on the Property was never transferred to defendant. The Option Agreement did not require defendant to satisfy the mortgage balance upon payment. In exchange for receiving all rights to the Property, defendant provided Anthony and Denise the total sum of ten dollars.

On or about March 28, 2008, defendant prepared a Quitclaim Deed which Anthony and Denise signed without counsel. The Quitclaim Deed transferred title to the Property to defendant outright. Defendant provided no additional consideration for these rights but testified that, at this point, he had invested a total of $1,500 into the Property by way of repairs and improvements.

The documents only placed obligations on the plaintiffs. Maldonado testified that since he knew he would keep his word, he thought it only necessary that the plaintiffs' obligations were reduced to writing and signed by plaintiffs. Experienced in sales and real estate, Maldonado was confident that no education or training beyond his own was necessary to negotiate this transaction. The documents he prepared were inconsistent with each other and, if read literally, absolutely unconscionable. On paper, Maldonado obtained title to the house while Denise maintained the mortgage responsibility with an option to buy back the Property for $400,000 within one year.

After first trying (with Denise's knowledge, authorization and financial documents) to negotiate a refinance or loan modification agreement with the mortgagee, Maldonado successfully negotiated the Formal Repayment Agreement, which Denise signed on March 21,

8

2008.  Maldonado represented to the D'Agostinos that he could provide the services of a debt

adjuster.  A debt adjuster is defined as:

> a person who either (a) acts or offers to act for a consideration as an
> intermediary between a debtor and his creditors for the purpose of settling,
> compounding, or otherwise altering the terms of payment of any debts of
> the debtor, or (b) who, to that end, receives money or other property from
> the debtor, or on behalf of the debtor, for payment to, or distribution
> among, the creditors of the debtor.

N.J.S.A. § 17:16G-1 (c)(1). [2]  Debt adjusters must be a non-profit entity and are required to be

licensed with the New Jersey Department of Banking and Insurance.  See N.J.S.A. § 17:16G-2:

> a.  No person other than a nonprofit social service agency or a nonprofit
>     consumer credit counseling agency shall act as a debt adjuster.
> b.  It shall be unlawful for any nonprofit social service agency or
>     nonprofit consumer credit counseling agency to act as a debt adjuster
>     without first obtaining a license from the Commissioner of the
>     Department of Banking pursuant to this act.

Maldonado promised that he would pay $9,000 to the lender on March 21, 2008, and then make

payments of $5,391.39 on April 21, 2008, and monthly thereafter through February 21, 2009.

Anthony and Denise agreed to "vacate the Property" by January 31, 2008.  Maldonado would

then restore and rent Denise's apartment on the second floor of the back house, fix up the front

---

[2] The statute does specify certain individuals who would not qualify as debt adjusters:

> The following persons shall not be deemed debt adjusters: (a) an attorney-at-law of this State who
> is not principally engaged as a debt adjuster; (b) a person who is a regular, full-time employee of a
> debtor, and who acts as an adjuster of his employer's debts; (c) a person acting pursuant to any
> order or judgment of court, or pursuant to authority conferred by any law of this State or the
> United States; (d) a person who is a creditor of the debtor, or an agent of one or more creditors of
> the debtor, and whose services in adjusting the debtor's debts are rendered without cost to the
> debtor; (e) a person who, at the request of a debtor, arranges for or makes a loan to the debtor, and
> who, at the authorization of the debtor, acts as an adjuster of the debtor's debts in the disbursement
> of the proceeds of the loan, without compensation for the services rendered in adjusting those
> debts; or (f) a person who is: (i) certified by the United States Secretary of Housing and Urban
> Development as a housing counseling organization or agency pursuant to section 106 of Pub.L.90-
> 448 (12 U.S.C. § 1701x); (ii) participating in a counseling program approved by the New Jersey
> Housing and Mortgage Finance Agency; and (iii) not holding or disbursing the debtor's funds.

N.J.S.A. § 17:16G-1 (c)(2).  Maldonado does not fall under any of the exceptions set forth in the statute, as although
he was authorized by the plaintiffs to arrange for a loan modification on their behalf, he was receiving compensation
for his services.

9

house and increase the rent rolls. He would also see to it that the foreclosure action did not go to Sheriff's Sale and that the mortgage loan was reinstated. He did this, without paying anything to himself for his services or to reimburse himself for his net out-of-pocket outlays which, as of March 2010, he claimed were $49,615. Maldonado collected rents and paid expenses. He made no payment other than $10 directly to plaintiffs.

The parties agree that at the time of this transaction the fair market value of the Property was $480,000.

Anthony, who was unable to refinance to buy back the Property, offered to pay Maldonado $40,000 for the return of the Property. In Anthony's mind, Maldonado was entitled to $40,000 (the $400,000 buy-back number minus the $360,000 mortgage at the time of the original transfer). Anthony believed, as did the defendant at the time of the original transaction, that the rents received would cover the costs associated with the Property. Maldonado rejected Anthony's offer, seeking the full $400,000 he was entitled to under the signed documents. Maldonado took the position that he owned the Property and it could only be purchased for $400,000, which included the pay-off for Denise's mortgage (although the documents do not make payment of the mortgage obligation a condition of the buy-back). In essence the documents, when taken as a whole, reflect that a $480,000 rental property changed hands for $10 with an option to buy it back within 12 months for $400,000. Even if the $360,000 mortgage is presumed to be paid by Maldonado, the transaction still involved the transfer of $120,000 in equity (the $480,000 market value minus the $360,000 mortgage) for $10 and the option to buy back the Property within one year for $400,000.

Plaintiffs argue that this transaction constitutes common law fraud. In order to prevail on a claim for common law fraud the plaintiff must prove the following five elements: (1) a material

10

misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other party rely on it; (4) reasonable reliance thereon by the other party; and (5) resulting damages.  Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997).  The party alleging common law fraud bears the burden of proving the elements of fraud by clear and convincing evidence.  See Stochastic Decisions, Inc. v. DiDomenico, 236 N.J. Super. 388, 395 (App. Div. 1989) (citing Albright v. Burns, 206 N.J. Super. 626, 636 (App. Div. 1986)).  Plaintiffs argue that the transaction contrived by defendant constituted a fraud in that the trust documents mislead Anthony into thinking the property was placed in trust for his children. Although Anthony testified to that effect at one point in his testimony, his testimony was so contradictory and unreliable that it does not amount to clear and convincing evidence that he relied on a material misrepresentation of presently existing or past fact, or that Maldonado intended him to rely on such misrepresentation.  Maldonado claimed that while the establishment of a trust was first suggested by Anthony, he used the trust—which was executed in tandem with another document placing the beneficial interest of the trust in Maldonado—merely as a way to escape the "due on sale" clause of the mortgage.  The plaintiffs have therefore failed to meet the evidentiary burden necessary to establish common law fraud.[3]

While the Court does not find the defendant liable for common law fraud, this transaction does constitute a violation of the Consumer Fraud Act ("CFA"), N.J.S.A. § 56:8-2.  For a claimant to prove a violation under the CFA, a "plaintiff must [establish] each of three elements:

---

[3] The plaintiffs' complaint also contains a count for negligent misrepresentation against Ricardo Maldonado, a count for quiet title, a count for civil conspiracy, a count for aiding and abetting against Luis A. Ramos, and a count against all Defendants for breach of fiduciary duty.  On August 25, 2009, the Court dismissed Luis A. Ramos for plaintiffs' failure to prosecute.  Plaintiffs have not presented any evidence suggesting the involvement of anyone other than Maldonado, and thus the conspiracy count is hereby dismissed.  By this decision the Court voids the transfer of the property, as it was a product of the unconscionable commercial practice found to be a violation of the CFA, and thus the relief requested by the quiet title count is already granted. Plaintiffs have not met their evidentiary burden as to the breach of fiduciary duty and negligent misrepresentation claims.

11

(1) unlawful conduct by the defendant [ ]; (2) an ascertainable loss on the part of the plaintiff;

and (3) a causal relationship between the defendant['s] unlawful conduct and the plaintiff's

ascertainable loss." N.J. Citizen Action v. Schering-Plough Corp., 367 N.J. Super. 8, 12–13

(App. Div.), certif. denied, 178 N.J. 249 (2003).  N.J.S.A. § 56:8-20[4] requires that "any party to

an action asserting a claim . . . based upon violation of this act . . . shall mail a copy of the initial

or responsive pleading . . . to the Attorney General."[5]   Under the CFA, it is a violation for any

person to use or employ:

> any unconscionable commercial practice, deception, fraud, false
> pretense, false promise, misrepresentation, or the knowing,
> concealment, suppression, or omission of any material fact with
> intent that others rely upon such concealment, suppression or
> omission, in connection with the sale or advertisement of any
> merchandise or real estate, or with the subsequent performance of
> such person as aforesaid, whether or not any person has in fact
> been misled, deceived or damaged thereby.

N.J.S.A. § 56:8-2.

   The CFA "was designed to prevent deception, fraud or falsity, whether by acts of

commission or omission, in connection with the sale and advertisement of merchandise and real

estate." Delaney v. Garden State Auto Park, 318 N.J. Super. 15, 19–20 (App. Div. 1999); see

also Barry v. Arrow Pontiac, Inc.,100 N.J. 57, 69 (1985).  As the purpose of this remedial

---

[4] The court in Zorba Contractors, Inc. v. Housing Auth.,City of Newark,  found the purpose of N.J.S.A. § 56:8-20 to
be as follows:
> In addition, N.J.S.A. 56:8-20 requires any party who asserts a private claim under
> N.J.S.A. 56:8-19 to give the Attorney General notice of the claim, so that the Attorney
> General can determine whether to intervene in the action. The evident objective of this
> provision is to afford the Attorney General an opportunity to seek the expansive forms of
> equitable relief authorized by N.J.S.A. 56:8-8 and -9 by intervening in a private CFA
> action. Thus, the 1971 amendments to the CFA authorized defrauded consumers to bring
> private actions primarily for individual legal relief while continuing to confer authority
> and responsibility upon the Attorney General to seek equitable relief in the interests of
> the public at large.

362 N.J. Super. 124, 138 (App. Div. 2003) (internal citations omitted).
[5] Although not timely filed with the Court, upon request from chambers the plaintiff was able to provide proof of
compliance.  An affidavit of service dated March 20, 2009, and an acknowledgement letter from the Office of the
Attorney General dated April 15, 2009, were submitted to the Court prior to the issuance of this opinion.

legislation is to protect the consumer, the CFA is to be construed liberally by the courts. Barry v. Arrow Pontiac, Inc., 100 N.J. at 69; see also Lemelledo v. Beneficial Mgmt., 150 N.J. 255, 265 (1997) ("the CFA could not possibly enumerate all, or even most, of the areas and practices that it covers without severely retarding its broad remedial power to root out fraud . . . ."). The transaction at issue in this case was comprised of a multitude of legal documents drafted by a layperson. The defendant drafter admitted that these documents only recorded the obligations of the plaintiffs and did not comport with the parties' understanding of their agreement. A transaction using such one-sided and misleading documents is most certainly an "unconscionable commercial practice." See Kugler v. Romain, 58 N.J. 522, 12–15 (1971) (citing the seller's incomprehensible contracts, false representations as to the discrepancy between sale price and actual value of merchandise, and the overall nature of the agreement, as the basis for the Court's finding that the seller had violated the CFA).

The court in O'Brien v. Cleveland, found the defendants to have violated the CFA when presented with a similar scheme. 423 B.R. 477 (Bankr. D.N.J. 2010). In Cleveland, plaintiffs were referred to defendant, Cleveland, for "unconventional financing" when they found themselves on the brink of a foreclosure sheriff's sale. Cleveland, like Maldonado, brokered a transaction whereby plaintiffs deeded their home to him for far less consideration than it was worth,[6] in exchange for assistance in escaping the clutches of foreclosure until such time that they could exercise a buy-back option. Id. at 488. The O'Brien court found that "Cleveland took unfair advantage of the O'Briens predicament to enrich himself to the tune of $100,000 and potentially much more" and that such conduct "is an unconscionable commercial practice in violation of the CFA . . . ." Id.

---

[6]  The property in Cleveland was worth an estimated value of $800,000, and deeded to the defendant in exchange for approximately $530,000.

While the plain language of the CFA makes the act applicable to all persons[7] involved in the "sale or advertisement of any merchandise or real estate,"[8] courts have held the CFA applicable to professional and part-time merchants as they can be said to be involved in commercial practices.[9] The CFA is not applicable to the casual seller.[10] Prior to his involvement with the D'Agostinos, Maldonado had been a party to other real estate transactions involving distressed properties. Each one involved a different situation and no proof was presented that he engaged in other fraudulent transactions, or that the other parties did not believe they were well-served by the transaction. Maldonado's past experience in this area of business, however, is sufficient to bring him under the purview of the CFA. The applicability of the CFA to Maldonado's business dealings is further supported by the fact that he advertised for his services. It was this advertisement, displayed on the side of his car, which brought Maldonado to the attention of the plaintiffs.

In his prior real estate transactions, Maldonado may also have taken advantage of vulnerable people in financial difficulties; however, he certainly could also have presented a more favorable option than the inevitable, seemingly inexorable, financially draining, mortgage foreclosure process. Frequently people in ill health or facing a divorce have personal difficulties as well as financial difficulties. Their personal issues make them particularly unable to face down financial institutions or boldly develop a plan to extricate themselves from a financial

---

[7] N.J.S.A. § 56:8-1(d) defines "The term "person" as used in this act [to] include any natural person or his legal representative, partnership, corporation, company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestuis que trustent thereof."
[8] N.J.S.A. § 56:8-2.
[9] See, e.g., Jackson v. Manasquan Savings Bank, 271 N.J. Super. 136, 146 (Law Div. 1993). Although the court in Jackson did not reach a determination as to whether or not the CFA applied to a bank involved in the sale of real estate, in leaning towards finding the CFA applicable, the court focused its inquiry not on "the fact that the seller infrequently sold real estate, but rather that the Act was only intended to apply to 'unconscionable *commercial* practices.'"
[10] See, e.g., Byrne v. Weichert Realtors, 290 N.J. Super. 126 (App. Div. 1996) (the CFA does not apply to the non-professional seller of real property, but does apply to those involved in commercial practices).

morass. Maldonado bought properties for below-market value, improved the property, or found a willing buyer without improving the property, and sold at a profit. Although uneducated, his street sophistication and moxie allowed him to profit, while putting some money into the hands of the distressed homeowners that they may not have had the ability to obtain for themselves. According to Maldonado, he kept his word in these deals and worked hard; unafraid, experienced, and self-taught in how to deal with financial institutions.

The CFA mandates, with no discretion permitted, an award of treble damages, as well as reasonable counsel fees, once the claimant has established a CFA violation and an ascertainable loss. Cox v. Sears Roebuck, 138 N.J. 2, 24 (1994). In this case, the requisite result imposed by the finding of a violation under the CFA may be harsh, but it is mandated by law.

Thus although it appears to this Court that Maldonado's actions were motivated by what he viewed as legitimate profit, rather than an intent to defraud, his actions nonetheless constituted a violation of the CFA, and thus the Court is bound by the statute. See Skeer v. EMK Motors, Inc., 187 N.J. Super. 465, 470 (App. Div. 1982) ("The act is broadly designed to protect the public, even when a merchant acts in good faith."). While Maldonado may have kept up his end of the oral agreement, his written agreements were severely one-sided and unconscionable in that they did not conform to statutory requirements[11] and were contradictory.[12] Additionally, he

---

[11] The transaction orchestrated by the defendant lead plaintiffs to believe he was their "last hope" and only alternative to foreclosure. In so doing, Maldonado kept plaintiffs in the dark regarding statutory protections and alternatives in place for individuals in their situation. For example, the Fair Foreclosure Act, N.J.S.A. 2A:50-1, et. seq., would have provided Plaintiffs with the right of redemption giving them a statutory window to buy back their property. See also O'Brien, 423 B.R. at 483 (finding a similar mortgage rescue scheme to be "in reality, a financing transaction subject to the Truth In Lending Act ("TILA") as amended by the Home Ownership and Equity Protection Act ("HOEPA") as well as the New Jersey Home Ownership Security Act of 2002 ("HOSA").").

[12] For example, the trust documents which at once made defendant trustee and plaintiffs beneficiaries also placed the beneficial interest in the trustee. On January 13, 2008, the parties executed the P-12, a warranty deed to trustee which placed the property in trust. On January 17, 2008, the parties executed documents P-11 and P-14. P-11 is an agreement and declaration of trust and names Anthony and Denise as the beneficiaries, but P-14, the assignment of beneficial interest in trust, assigns the beneficial interest in the trust to the trustee, Maldonado.

Footnote continued on next page.

held out an unlikely prospect of repurchasing the property and thereby obtained an unreasonable profit from the transaction. To hold that Maldonado did not violate the CFA because he was not formally educated, and was seemingly unaware of the legal implications of his behavior, would vitiate the intention of the CFA.

Maldonado claims that he put $49,615[13] into this Property (after accounting for rents received by him), claiming that he used every cash withdrawal from his bank account and every charge to a home improvement store during this time period exclusively for this Property. He is unable to prove all of his expenses. On cross-examination Maldonado conceded that at least one of his claimed expenses (in the amount of $1,000) was a mistake. Maldonado was extremely frugal in his spending and kept reliable records of expenditures. Believing that he owned the Property, however, he did not anticipate the need to go back months later and designate what was spent on the D'Agostino property and what was spent elsewhere. His receipts from home improvement stores could have been for this Property, or his own home. He claimed to use a debit card for even the smallest personal expense, but that testimony was hard to believe. He paid his workers in cash and certainly had some need to pay workers on his own residence during the course of the past two years. Thus it is not completely clear exactly how much of his own money Maldonado paid to keep up the Property. Maldonado was a generally credible witness. His testimony that the vast majority of the expenditures he claimed were indeed put towards the Property is accepted as fact by the Court. It is reasonable to find that ten percent of the expenditures claimed by Maldonado were actually for personal use rather than the Property. Thus the amount Maldonado is found to have spent on the Property is reduced from the amount

---

Another example of the contradictory nature of the documents, is the fact that the option agreement—which all parties believed gave the D'Agostinos the option to buy back the property—made the right to exercise the option exclusive to signatories of the document and yet the option agreement was not signed by the D'Agostinos.
[13] Exhibit D-40.

claimed of $49,615 to $44,653.    This roughly $5,000 deduction includes the $1,000 acknowledged error.

The D'Agostino's are also entitled to recovery of reasonable counsel fees under the CFA, and pursuant to R. 4:42-9(a)(8).  The plaintiff's counsel has certified to billing $92,142.50 in fees and $1,911.73 in costs.  Defense counsel, in letters dated June 2, 2010, and June 25, 2010, objects to the award of fees, but has declined to take issue with the amount requested.  Whether Denise's father actually paid the fees is of no import.  Grow v. Chokshi et al., 403 N.J. Super. 443, 471–72 (App. Div. 2008).  In considering the reasonableness of counsel fees, the Court is guided by R.P.C. 1.5.  Rendine v. Pantzer, 141 N.J. 292, 317–19 and 335–45 (1995), Furst v Einstein Moomjy, Inc., 182 N.J. 1, 20–24 (2004).  The hourly rates charged by plaintiff's counsel (the highest being $275 per hour) are reasonable in comparison to fees customarily charged in Bergen County.  The hourly rates will not be altered by the Court.  After review of the time sheets, certain charges are disallowed.  Trial hours mistakenly charged on Sunday, April 11, 2010, ($1,457.50) and charges for the second of two lawyers to attend trial on April 12, 13, 27, 28, and May 3, 2010, (totaling $3,387.50) are disallowed.  The amount of time expended in litigating this case was made excessive by the plaintiffs' conduct.  Denise obtained an FRO against Anthony in September 2007, rendering them unable to contribute collaboratively to their representation.  Additionally, both plaintiffs demonstrated an inability to be forthcoming on the stand—even when being questioned by their own counsel—which unnecessarily prolonged the trial, so that Anthony's five days of testimony were essentially useless.  Charges by plaintiffs' counsel totaling $11,412.50 for these five days are disallowed.  The plaintiffs' courtroom demeanor is indicative of the challenge they posed as clients and is found to be the cause of the unreasonable amount of time spent in litigating and preparing to litigate this case.  It would be

17

inequitable for the defendant to pay for unreasonable counsel fees incurred as a result of the plaintiffs' conduct. This Court finds, based on observations at trial and the fact that the restraining order likely presented an obstacle in representation, that the amount of time should be reduced by one-third beyond the $16,257.50 in reductions enumerated above. That calculation results in a total reasonable counsel fee of $50,590. Plaintiffs are entitled to full costs of $1,912 .

The conveyance of title from the D'Agostinos to Maldonado is deemed void as it was the product of a transaction held to be a violation of the CFA.[14] Additionally, it might spur further litigation from the lender if the mortgaged property were not returned to the plaintiffs. Title in the property remains with the D'Agostinos as if no conveyance took place. The mortgage will remain in Denise's name and will continue to be her responsibility.

The plaintiffs have established their ascertainable loss as being the loss in equity in their home minus the improvements made to the property by defendant. This figure comes out to $75,347. This total represents the agreed upon value of the home, $480,000, minus the sum of the mortgage, $360,000 (since all parties did assume the mortgage to be Maldonado's responsibility after the transfer of title) and the $44,653 worth of improvements (after accounting for rents) made by the defendant. This Court is bound by the CFA and thus plaintiffs are entitled to treble damages. In granting the equitable relief of returning the property to the plaintiffs, the Court has—in essence—provided the plaintiffs with one third of the treble damages to which they are entitled. The return of the property compensates them for their ascertainable loss and makes them whole. The plaintiffs are thus entitled to the remaining two thirds of the treble damage award required by the CFA, in the amount of $150,694, as well as $50,590 in reasonable

---

[14] See Scott v. Mayflower Home Imp. Corp., 363 N.J. Super. 145, 160 (Law Div. 2001), rev'd in part on other grounds, 378 N.J. Super. 221 (App. Div. 2005) (finding that contracts obtained through practices which violated the CFA were void and unenforceable).

counsel fees and $1,912 in costs for a total of $203,196.  As requested, Anthony's portion of this
award will be held in escrow to guarantee his child support obligation.