**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| FREDERICK CLEVELAND AND CLEVELAND DEVELOPMENT LLC, | : | |
| | : | |
| Appellants, | : | Civ. No. 10-3169 (GEB) |
| | : | |
| v. | : | |
| | : | |
| SEAN MICHAEL O'BRIEN AND NICOLE MARIE O'BRIEN, | : | **MEMORANDUM OPINION** |
| | : | |
| Appellees. | : | |

**BROWN, Chief Judge**

This matter comes before the Court upon Defendants/Appellants Frederick Cleveland and

Cleveland Development LLC's ("Appellants") appeal from an Order for Partial Judgment and an

Order for Final Judgment entered by the United States Bankruptcy Court for the District of New

Jersey ("Bankruptcy Court") which granted partial and final judgment against Appellants and in

favor of Plaintiffs/Appellees Sean Michael O'Brien and Nicole Marie O'Brien ("Appellees").

Appellees have opposed Appellants' present appeal. The Court has considered this matter based

upon the parties' submissions and without oral argument pursuant to Federal Rule of Civil

Procedure 78. For the reasons set forth below, the Court will affirm all aspects of the Bankruptcy

Court's judgment.

**I.        BACKGROUND**

1

**A. Facts**[1]

Appellees filed a Chapter 13 bankruptcy petition on March 7, 2003, in part to prevent foreclosure of their home. *O'Brien v. Cleveland* (*In re O'Brien*), 423 B.R. 477, 483 (Bankr. D.N.J. 2010). However, Appellees were ultimately unable to satisfy the Chapter 13 plan the Bankruptcy Court had approved, and foreclosure proceedings were initiated in late 2006. *Id.* (Appellants' Br. at 6; Doc. No. 4.) (Appellees' Br. at 4; Doc. No. 5.) The Appellees owed $519,481.00 on their home at that time. (Cert. of Debtor ¶ 7; Rec. on Appeal Item No. 15; Doc. No. 2.) *See O'Brien*, 423 B.R. at 485. Unable to obtain conventional financing to satisfy this debt, Appellees were referred by a mortgage broker to Appellants. (Compl. ¶ 9; Rec. on Appeal Item No. 1; Doc. No. 2.) (Transcript of Trial 69:7-12; Rec. on Appeal Item No. 5; Doc. No. 2.) (Appellants' Br. at 8.)

Appellants purchased Appellees' home, valued at over $800,000.00 (*see O'Brien*, 423 B.R. at 491), for $555,232.00 on or around July 31, 2007. (Compl. ¶ 12.) (Standard Real Estate Purchase and Sale Agreement; Rec. on Appeal Item No. 14; Doc. No. 2.) Appellees entered into a purported lease buyback agreement with Appellants pursuant to which Appellees were required to pay $5,000.00 in rent per month and had the option to purchase the property within two years for $650,483.83. (Compl. ¶ 12; Rec. on Appeal Item No. 1; Doc. No. 2.) (Lease Agreement Buyback; Rec. on Appeal Item No. 14; Doc. No. 2.) The lease further provided that if a rent payment was not made within five days of the beginning of each month, Appellees would be

---

[1] The Court relies extensively on the Bankruptcy Court's findings of fact. "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." FED. R. BANKR. P. 8013.

responsible for a late charge of $10.00 per day for each day the rent or any portion thereof remained unpaid.  (Lease Agreement Buyback.)  Appellees were not represented by independent counsel during the course of their dealings with Appellants; rather, Appellants' attorney prepared all the documents involved, while charging both Appellees and Appellants for legal services. *O'Brien*, 423 B.R. at 485, 499.[2]

Before the agreement with Appellants was finalized, however, Appellees were contacted by a different foreclosure rescuer ("Rescuer #2").  (Appellants' Br. at 12) *O'Brien*, 423 B.R. at 484.  Appellees and Rescuer #2 signed a contract of sale whereby Rescuer #2 would pay Appellees $800,000.00 for their home, an arrangement which Appellees' bankruptcy lawyer had approved by the Bankruptcy Court.  (Residential Contract of Sale; Rec. on Appeal Item No. 15; Doc. No. 2.)  (Order Authorizing Sale of Real Property; Rec. on Appeal Item No. 15; Doc. No. 2.) *O'Brien*, 423 B.R. at 484.  However, this transaction was never completed and was ultimately abandoned by Appellees because Appellants had already filed a notice of settlement with the county clerk.  *O'Brien*, 423 B.R. at 484.

After purchasing Appellees' home, Appellants obtained a mortgage in the amount of $646,000.00, based on Appellants' listing of the home's sales price as $808,000.00 on its U.S. Department of Housing and Urban Development ("HUD") Uniform Settlement Statement ("Statement").  (HUD Statement; Rec. on Appeal Item No. 14; Doc. No. 2.)[3]  Appellants

_____

[2] This attorney, William E. Gahwyler, was a defendant in the Bankruptcy Court action, but is not an Appellant in the present proceedings.

[3] Appellants also listed $808,000.00 as the amount paid Appellees on the NJ Seller's Residency Certification form.  (Seller's Residency Certification/Exemption; Rec. on Appeal Item No. 14; Doc. No. 2.)  In fact, as already discussed, Appellants actually purchased Appellees' home for $555,232.00.  (Standard Real Estate Purchase and Sale Agreement.)

defaulted on the mortgage and the lender initiated foreclosure proceedings on the home. *O'Brien*, 423 B.R. at 486.

### B. Procedural History

Appellees filed their adversary complaint in Bankruptcy Court on June 26, 2008. (Rec. on Appeal Item No. 1; Doc. No. 2.) In their complaint, Appellees raised nine counts, alleging common law fraud and conspiracy to defraud, violation of the New Jersey Consumer Fraud Act ("CFA"), N.J. STAT. ANN. § 56:8-1, *et seq.*, conversion and conspiracy to commit conversion, violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*, violation of the New Jersey Home Ownership Security Act of 2002 ("HOSA"), N.J. STAT. ANN. § 46:10B-22, *et seq.* and the NJ Predatory Lending Statute, violation of the Home Ownership and Equity Protection Act ("HOEPA"), 15 U.S.C. § 1639, breach of contract, legal malpractice, and breach of fiduciary duty. (*Id.*) Appellees sought rescission of the sale transaction between them and Appellants, rescission of the mortgage security interest on the real property, restraints precluding Appellants from transferring, conveying, or disposing of the property in any manner, a court order allowing Appellants to pay the $4,600.00 [*sic*][4] mortgage payment directly to the mortgage holder, compensatory damages trebled, punitive damages, attorneys' fees and costs of suit, injunctive and equitable relief, and other relief deemed just by the court. (*Id.*) Appellants filed their answer on August 22, 2008, providing general denials and affirmative defenses. (Rec. on Appeal Item No. 2; Doc. No. 2.)

The trial commenced before the Bankruptcy Court on December 3, 2009. (Transcript of

---

[4] This presumably should state "$46,000.00." (*See* Rider Annexed to Contract of Sale; Rec. on Appeal Item No. 14; Doc. No. 2.)

Trial.)  On January 22, 2010, the Bankruptcy Court rendered its decision in *O'Brien v. Cleveland*.

The Bankruptcy Court entered an Order for Partial Judgment on February 2, 2010, whereby

judgment was entered in favor of Appellees and against Appellants.  (Rec. on Appeal Item No.

10; Doc. No. 2.)  Specifically, the Bankruptcy Court found in favor of Appellees:

> (a) on the First Count of the complaint (for fraud) for damages in the amount of
> $116,791.49;
> (b) on the Second Count of the complaint (for violations of [CFA]) for treble
> damages in the amount of $350,374.47;
> (c) as additional equitable relief for violation of CFA voiding the deed from
> Plaintiffs to Cleveland dated July 31, 2007;
> (d) on the Fourth and Sixth Count of the complaint (for violation of [TILA],
> amended by [HOEPA]) damages equal to the sum of all finance charges and fees
> in the amount of $240,875.32 plus statutory damages of $4,000;
> (e) for violation of TILA rescinding the transaction by voiding the deed from
> Plaintiffs to Defendant Frederick Cleveland dated July 31, 2007;
> (f) on the Fifth Count of the complaint (for violation of [HOSA]) for statutory
> damages equal to the finance charges plus 10% of the amount financed being a
> total of $293,836.17;
> (g) on the Seventh Count of the complaint (breach of contract) for damages in the
> amount of $46,000 plus pre-judgment interest to be calculated at the federal rate
> from the date of filing of the complaint.

(Rec. on Appeal Item No. 10; Doc. No. 2.)  The Bankruptcy Court entered its Order for Final

Judgment on May 17, 2010, awarding $33,932.50 in attorneys' fees plus costs of $627.50 to

Appellees for Appellants' violations of CFA, TILA, and HOSA.  (Doc. No. 1-1.)

Appellants filed their notice of appeal on May 28, 2010.  (Doc. No. 1.)  The issues

Appellants present on appeal are:

> 1. Whether the Bankruptcy Court erred in permitting Edward Hanratty, Esq. to
> testify as an expert witness regarding 'mortgage foreclosure rescue scams' . . . .
> 2. Whether the Court erred in considering the expert testimony and a purported
> expert report by Edward Hanratty, Esq. . . . .
> 3. Whether the Court erred in finding in favor of Plaintiffs regarding their claim
> for fraud, and entering judgment: (a) avoiding Plaintiffs' deed to Cleveland and
> (b) awarding damages in the amount of $116,791.49.

4. Whether the Court erred in finding in favor of Plaintiffs regarding their [CFA] claim, and entering judgment awarding treble damages to Plaintiffs in the amount of $359,374.47.

5. Whether the Court erred in finding that the transaction between Cleveland and Plaintiffs constituted an equitable mortgage.

6. Whether the Court erred in finding that the Plaintiffs did not act with unclean hands, and finding that Cleveland could not rely on such equitable defense with respect to the Court's findings.

7. Whether the Court erred in finding, with respect to [TILA]: (a) that Cleveland is a 'creditor' under TILA; (b) that the transaction between Plaintiffs and Cleveland constituted a 'high interest loan' under TILA; (c) that Cleveland was required to make standard disclosures under TILA; (d) that Cleveland was required to make enhanced disclosures under [HOEPA], as incorporated by TILA; and (e) that Cleveland failed to comply with TILA and HOEPA's prohibition of certain terms.

8. Whether the Court erred in finding in favor of Plaintiffs regarding their claim(s) under TILA and HOEPA, awarding damages in the amount of $242,875.32, along with attorneys' fees and costs, and rescinding the transaction between Plaintiffs and Cleveland.

9. Whether the Court erred in finding in favor of Plaintiffs regarding their claim under [HOSA], awarding damages in the amount of $293,836.17.

10. Whether the Court erred in finding in favor of Plaintiffs on their breach of contact claim, awarding damages in the amount of $46,000 plus prejudgment interest.[5]

11. Whether the Court erred in granting Plaintiffs an award of attorneys' fees in the amount of $33,932.50, plus costs in the amount of $627.50 for violations of [CFA, TILA, and HOSA].

(Appellants' Br. at 1-3.)

After reviewing the parties' submissions and the Bankruptcy Court's judgment, the Court affirms as to all issues raised on appeal.

## II.    DISCUSSION

### A.  Standard of Review

"On an appeal the district court . . . may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." FED. R. BANKR.

---

[5] This issue is not been considered by the Court because it was not briefed by Appellants.

P. 8013.  The Court reviews "the Bankruptcy Court's legal determinations de novo, its factual findings for clear error, and its exercises of discretion for abuse thereof."  *Professional Ins. Mgmt. v. Ohio Casualty Group of Ins. Cos.*, 285 F.3d 268, 282-83 (3d Cir. 2002) (citing *In re Engel*, 124 F.3d 567, 571 (3d Cir. 1997)); *see also Donaldson v. Bernstein*, 104 F.3d 547, 551 (3d Cir. 1997).  "[T]he clearly erroneous standard is fairly stringent: 'It is the responsibility of an appellate court to accept the ultimate factual determination of the fact-finder unless that determination either is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data.'"  *Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Inc.*, 57 F.3d 1215, 1223 (3d Cir. 1995) (quoting *Hoots v. Pennsylvania*, 703 F.2d 722, 725 (3d Cir. 1983)).

### B.  The judgment of the Bankruptcy Court is affirmed as to all issues raised on appeal.

#### i.  If the Bankruptcy Court erred in permitting Edward Hanratty, Esq. to testify as an expert witness regarding mortgage foreclosure rescue scams, this error was harmless.

The U.S. Supreme Court has held that "[a]buse of discretion is the proper standard of review of . . . evidentiary rulings."  *General Electric Co. v. Joiner*, 522 U.S. 136, 141 (1997).  In coming to its decision, the appellate court must determine whether the error was legally harmless.  *See United States v. Mathis*, 264 F.3d 321, 342 (3d Cir. 2001).  "In a civil case, an error is harmless if it is highly probable that it did not affect the complaining party's substantial rights" (*Betterbox Communications Ltd. v. BB Technologies, Inc.*, 300 F.3d 325, 329 (3d Cir. 2002)) and "'that the error did not contribute to the judgment.'"  *Holbrook v. Lykes Bros. Steamship Co.*, 80 F.3d 777, 787 (3d Cir. 1996) (quoting *Advanced Medical, Inc. v. Arden Medical Services, Inc.*,

955 F.2d 188, 199 (3d Cir. 1992)).

After examining the record, the Court finds that even if the Bankruptcy Court erred in allowing Mr. Hanratty to testify as an expert on the issue of mortgage foreclosure rescue scams, any error was harmless, as the testimony at issue did not affect the judgment.  In its decision, the Bankruptcy Court stated: "Defendants objected to the expert's testifying on a variety of grounds . . . . The court permitted the testimony, but after hearing it, determined that the expert's opinions will not assist the court as the trier of facts. Therefore, the court has disregarded the expert's testimony."  *O'Brien*, 423 B.R. at 487.  The Court concludes that Appellants' contentions that Mr. Hanratty's testimony "resulted in undue prejudice to the Cleveland defendants" and that "the prejudicial effect of Mr. Hanratty's testimony could not be remedied, despite the Bankruptcy Court's contentions that the testimony itself was disregarded" are without merit.  (Appellants' Br. at 22, 23.)

Appellants question the Bankruptcy Court's ability to disregard the testimony, given its admitted "little prior experience and [] general lack of knowledge regarding the issue of mortgage foreclosure rescue scams" and the fact that the Bankruptcy Court did not say it would disregard the testimony during the trial.  (Appellants' Br. at 22, 24.)  The latter is not required and the former does not warrant a robust response.  The Bankruptcy Court apparently allowed the testimony, in part, because of its limited familiarity with this issue.  *See O'Brien*, 423 B.R. at 487.  After having heard the testimony, the Bankruptcy Court found it to be of little assistance and therefore disregarded it.  *See Id*.  This was within the Bankruptcy Court's discretion, as "[t]he Federal Rules of Evidence embody a 'strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact.'"  *Holbrook*, 80 F.3d at 780

(quoting *DeLuca v. Merrell Dow Pharmaceuticals, Inc.*, 911 F.2d 941, 956 (3d Cir. 1990)).  In any case, a straightforward reading of the decision makes it clear that this testimony did not affect the outcome of the case or Appellants' rights.  Thus, if the Bankruptcy Court erred in permitting Mr. Hanratty to testify, this error was harmless.

### ii.  The Bankruptcy Court did not err in finding in favor of Plaintiffs regarding their common law fraud and CFA claims.

#### a.  Common law fraud.

As the Bankruptcy Court correctly expressed, common law fraud has five elements: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages."  *O'Brien*, 423 B.R. at 487 (quoting *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 691 A.2d 350, 367 (1997)).

The Court has reviewed the Bankruptcy Court's findings of fact on this issue for clear error, and has found none.  Here, the Bankruptcy Court found that the elements of common law fraud were met.  Specifically, it found that:

> Cleveland failed to disclose to the O'Briens that he was using their house as collateral to borrow almost $650,000 when only $510,000 was needed to satisfy the O'Briens' mortgages and stop the sheriff's sale. This enabled Cleveland to strip off over $100,000 of equity in the O'Briens' home for himself. Furthermore, Cleveland failed to disclose that the monthly payments on this new loan were $6,300, and later increased to $6,800 per month; substantially more than the $5,000 per month the O'Briens agreed to pay. Thus, the O'Briens' monthly payments were insufficient to fund the debt service on the new loan. Lastly, Cleveland failed to inform the O'Briens that, in the event Cleveland did not make monthly payments, the new lender could foreclose even if the O'Briens were current on their monthly payments to him. This could lead to the loss of their home and the equity therein, just the outcome they desperately sought to avoid.

*O'Brien*, 423 B.R. at 487.  The Bankruptcy Court further found:

9

> All of these undisclosed facts were material. Cleveland knew these facts and intentionally concealed them from the O'Briens. They reasonably relied on the facts that they knew as the only way to save their home, not realizing that Cleveland was enriching himself at their expense and that their home remained in grave danger of foreclosure in any event. They have been damaged by the loss of title to their home and the increase in indebtedness encumbering the home.

*Id*.  The Bankruptcy Court determined that Appellees relied on these misrepresentations of material facts and suffered damages as a result.  *Id*.

Appellants respond by stating "the Bankruptcy Court, in making its determination that the transaction - despite the lack of deception or falsity - nevertheless constituted an unconscionable commercial practice, failed to give sufficient weight to the O'Brien's sophistication, and the level of their involvement in structuring the transaction."  (Appellants' Br. at 28.)  Appellants, however, fail to recognize that in the present context Appellees' sophistication and involvement are irrelevant.  To find common law fraud, Appellees needed only to reasonably rely on Appellants' material misrepresentation and suffer resulting damages (*see Gennari*, 691 A.2d at 367), which the Bankruptcy Court found they did.  *O'Brien*, 423 B.R. at 487.  Thus, here, the Bankruptcy Court found that the elements of common law fraud were met and this Court concludes that finding was not clearly erroneous.

### b.  CFA claim.

Appellants likewise maintain that they have not violated the CFA because "(a) the O'Briens' were sophisticated parties, well-informed of and intimately involved in the structuring of the transaction at issue, and (b) Cleveland acted in good faith, made no misrepresentations to the O'Briens, nor any material omissions . . . ."  (Appellants' Br. at 26.)  The Bankruptcy Court found that "[e]ven the most sophisticated consumers are entitled to the protections of the CFA"

and that Appellants' actions constituted "unconscionable commercial practice in violation of the CFA." *O'Brien*, 423 B.R. at 488.  The Court will affirm the Bankruptcy Court's judgment.

The CFA, N.J.S.A. § 56:8-2, states:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . . .

"To state a claim under the [CFA], a plaintiff must show: '(1) unlawful conduct by defendant; (2) an ascertainable loss by plaintiff; and (3) a causal relationship between the unlawful conduct and the ascertainable loss.'" *Nicholls v. Portfolio Recovery Assocs., LLC*, 2010 U.S. Dist. LEXIS 29639, *13 (D.N.J. 2010) (quoting *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 964 A.2d 741, 749 (2009)).  "[T]he history of the Act demonstrates a strong and consistent pattern of expanding rights of consumers and protecting them from a wide variety of marketplace tactics and practices deemed to be unconscionable." *Bosland*, 964 A.2d at 743.

Thus, the question of Appellees' sophistication and the fact that Appellees were involved in the process is irrelevant; the NJ Supreme Court decision in *Gennari v. Weichert Co. Realtors* is illustrative of this point: "Weichert argues that because of purchasers' meetings with the builder and inspections of other 'Rumberg' developments, they did not rely on Weichert's representations. At common law, independent investigations could signal a lack of reliance. Weichert's liability, however, arises from the Act, which does not require proof of reliance. Weichert is liable for misrepresentations whether 'any person has in fact been misled, deceived

11

or damaged thereby.'" 691 A.2d at 366 (quoting N.J.S.A. § 56:8-2) (internal citations omitted). In fact, "courts have held that 'it is the character of the transaction rather than the identity of the purchaser which determines if the Consumer Fraud Act is applicable . . . .'" *Electric Mobility Corp. v. Bourns Sensors/Controls, Inc.*, 87 F.Supp. 2d 394, 400 (D.N.J. 2000) (quoting *J&R Ice Cream Corp. v. California Smoothie Licensing Corp.*, 31 F.3d 1259, 1273-74 (3d Cir. 1994)). Moreover, "[v]iolation of the act can be shown even though a consumer has not in fact been misled or deceived. It is not necessary to show actual deceit or a fraudulent act; any unconscionable commercial practice is prohibited. A merchant's subjective good faith does not excuse technical noncompliance with regulations promulgated under the Consumer Fraud Act." *Skeer v. EMK Motors, Inc.*, 187 N.J. Super. 465, 455 A.2d 508, 511 (App. Div. 1982) (internal citations omitted).

Thus, Appellants' argument that there was no "deception, fraud or falsity" and that "Cleveland acted in good faith, made no misrepresentations to the O'Briens, nor any material omissions . . . " (Appellants' Br. at 26) does not mitigate his unconscionable conduct, which is violative of the CFA. "[Intent] is not an element of proof of deception under [the Act]; rather, the 'capacity to mislead is the prime ingredient.'" *New Jersey v. Hudson Furniture Co.*, 165 N.J. Super. 516, 398 A.2d 900, 902 (App. Div. 1979) (citing *Fenwick v. Kay American Jeep, Inc.*, 72 N.J. 372, 377, 378 (1977)). The Bankruptcy Court found, and this Court agrees, that Appellants had the capacity to mislead and, in fact, did mislead Appellees.

Furthermore, "[a] plaintiff need not even show reliance on the violation of the Act as long as an ascertainable loss resulting from defendant's conduct is demonstrated." *Leon v. Rite Aid Corp.*, 340 N.J. Super. 462, 774 A.2d 674, 677 (App. Div. 2001) (citing *Carroll v. Cellco*

12

*Partnership*, 313 N.J. Super. 488, 502 (App. Div. 1998)).  The Bankruptcy Court found that

Appellees suffered an ascertainable loss as a result of Appellants' conduct; namely, the

Bankruptcy Court found that Appellees were entitled to $116,791.49 in damages (before being

trebled as required by the CFA), or the difference between the new mortgage Appellants placed

on the home and the amount Appellees received in consideration.  *O'Brien*, 423 B.R. at 489.

In sum, the Bankruptcy Court relied on the following facts in finding Appellants conduct

was unconscionable and therefore violative of the CFA:

> Mr. Cleveland structured a transaction whereby the O'Briens deeded their home,
> worth around $800,000, to him in exchange for only approximately $530,000. He
> immediately stripped out over $100,000 for himself and left the O'Briens at risk
> of losing their home and the remaining equity therein to himself or the New
> Lender. Cleveland encountered the O'Briens in an exceedingly vulnerable
> position. They were on the brink of a sheriff's sale of their home and had
> exhausted all efforts to save it in both state and federal court. Cleveland took
> unfair advantage of the O'Briens predicament to enrich himself to the tune of
> $100,000[6] and potentially much more.

*O'Brien*, 423 B.R. at 488.  In light of these facts, and for the reasons noted above, this Court

concludes the Bankruptcy Court did not clearly err,  and will therefore affirm its finding.

### iii.  The Bankruptcy Court did not err in determining that the transaction at issue constituted an equitable loan or equitable mortgage.

The Court will affirm the Bankruptcy Court's determination that the transaction involved

in the present case, although nominally structured as a sale/leaseback transaction, is in actuality

an equitable mortgage.  "'The whole doctrine of equitable liens or mortgages is founded upon

that cardinal maxim of equity which regards as done that which has been agreed to be, and ought

---

[6] Appellants contend that this figure is inflated.  (Appellants' Br. at 28 n.5.)  The specific
amount is not determinative and, as this amount has nothing to do with calculating damages, the
figure is irrelevant.

13

to have been, done. . . . The form which an agreement shall take in order to create an equitable

lien or mortgage is quite immaterial, for equity looks at the final intent and purpose rather than at

the form.'" *In re Bridge*, 18 F.3d 195, 200 (3d Cir. 1994) (quoting *Rutherford Nat'l Bank v. H.R.*

*Bogle & Co.*, 114 N.J.Eq. 571, 169 A. 180, 182 (N.J. Ch. 1933)).  Thus, form is irrelevant, as:

> '[t]he doctrine has been firmly established from an early day that when the
> character of a mortgage has attached at the commencement of the transaction, so
> that the instrument, whatever be its form, is regarded in equity as a mortgage, that
> character of mortgage must and will always continue. If the instrument is in its
> essence a mortgage, the parties cannot by any stipulations, however express and
> positive, render it anything but a mortgage, or deprive it of the essential attributes
> belonging to a mortgage in equity.'

*Johnson v. Novastar Mortgage, Inc.*, 698 F.Supp. 2d 463, 469 (D.N.J. 2010) (quoting *Humble*

*Oil & Refining Co. v. Doerr*, 123 N.J. Super. 530, 303 A. 2d 898, 906-07 (Ch. Div. 1973)).  In

fact, "New Jersey courts have repeatedly found that sale-leaseback arrangements made to avoid

foreclosure are in fact equitable mortgages." *Id*.

　　　　The Bankruptcy Court thus did not err in its determination that the transaction at issue is

an equitable mortgage.  The Bankruptcy Court based this determination on a number of factors:

> (1) Cleveland Development's solicitation letter to the Plaintiffs contains . . . telling
> terminology . . . .(2) The 'Lease Agreement Buyback' provides for sale proceeds to
> be disbursed to the Plaintiff upon cancellation of the agreement. (3) The property
> had a value of over $800,000; however, the Defendant 'purchased' it for only
> $555,232. (4) The O'Briens have the option to repurchase their home for
> $650,483.83. (5) The O'Briens were not represented by counsel in the transaction.
> (6) The O'Briens were in financial distress. . . . (7) The Plaintiffs' intent was that
> this transaction was a loan, secured by their home. . . .

*O'Brien*, 423 B.R at 491.  Although Appellants claim that "at all times, Plaintiffs and Cleveland

intended the transaction to be a sale/leaseback with an option to repurchase" (Appellants' Br. at

32), the Court agrees with the Bankruptcy Court that the evidence shows "the transaction was

meant to refinance the mortgage allowing [Appellee] to keep his home." *O'Brien*, 423 B.R. at

492.  It is of no matter that "the documents memorializing the transaction clearly memorialize the

parties' intent to effectuate a sale of the Property to Cleveland, the subsequent lease of the

Property by Cleveland to Plaintiffs, and the eventual repurchase of the Property by Plaintiffs."

(Appellants' Br. at 32.)  Rather,"'[t]he rule is firmly established that a deed absolute on its face

intended only as security for a loan will be decreed to be operative as a mortgage. Equity will

look beyond the written instrument and explore the character of the transaction and the

contemporaneous intentions of the parties.'"  *James Talcott, Inc. v. Roto American Corp.*, 123

N.J. Super. 183, 202 (Ch. Div. 1973) (quoting *Vreeland v. Dawson*, 55 N.J. Super. 456, 465 (Ch.

Div. 1959)).  The Court joins the Bankruptcy Court in looking beyond the written instrument

here to the actual character of the transaction.  Furthermore, Appellants' arguments regarding the

intent of the parties does not change the Court's decision.  Rather, courts look to the "final

intent" of the parties; in the present case the final intent was clearly that Appellees keep their

home.

      Thus, this Court does not find clear error in the Bankruptcy Court's determination that the

transaction at issue was an equitable mortgage.[7]

---

[7] The Court notes that the Bankruptcy Court's decision has recently been utilized by another Judge in this District in finding that a sale-leaseback transaction similar to the one at issue was actually an equitable mortgage.  *Johnson*, 698 F.Supp. at 465.  In *Johnson v. Novastar Mortgage, Inc.*, the court persuasively used what it refers to as the "*O'Brien* factors" in determining that the sale-leaseback arrangement at issue was actually an equitable mortgage; specifically, the Court considered:

      (1) Statements by the homeowner or representations by the purchaser indicating an intention that the homeowner continue ownership; (2) A substantial disparity between the value received by the homeowner and the actual value of the property; (3) Existence of an option to repurchase; (4) The homeowner's

**iv. The Bankruptcy Court did not err in finding that Plaintiffs did not act with unclean hands and that Defendants could not rely on such equitable defense.**

The Bankruptcy Court did not err in its determination that Appellees did not act with unclean hands and that Appellants could not use the unclean hands doctrine as a defense. The unclean hands doctrine:

> is a self-imposed ordinance that closes the doors of a court of equity to one tainted with the inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. . . . [W]hile 'equity does not demand that its suitors shall have led blameless lives' as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue.

*Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814-15 (1945) (internal citations omitted). The Bankruptcy Court rightly stated: "The O'Briens' failure to fully inform the bankruptcy court, while regrettable, is nevertheless not the type of unconscionable conduct that should bar them from arguing for an equitable mortgage." *O'Brien*, 423 B.R. at 492. These actions are not a bar in the present case because:

> the primary principle guiding application of the unclean hands doctrine is that the alleged inequitable conduct must be connected, *i.e.*, have a relationship, to the matters before the court for resolution. We will not refuse relief to a party merely

---

> continued possession of the property; (5) The homeowner's continuing duty to bear ownership responsibilities, such as paying real estate taxes or performing property maintenance; (6) Disparity in bargaining power and sophistication, including the homeowner's lack of representation by counsel; (7) Evidence showing an irregular purchase process, including the fact that the property was not listed for sale or that the parties did not conduct an appraisal or investigate title; and (8) Financial distress of the homeowner, including the imminence of foreclosure and prior unsuccessful attempts to obtain loans.

*Id*. at 469-70. While not determinative, *Johnson's* reliance on the Bankruptcy Court's decision is probative.

because it has engaged in misconduct which is unrelated to its claims before the court. Only when 'some unconscionable act of one coming for relief has immediate and necessary relation to the equity that' that party seeks, will the doctrine bar recovery.

*New Valley Corp. v. Corporate Property Associates*, 181 F.3d 517, 525 (3d Cir. 1999) (quoting *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933)).  Moreover, "[w]hen applying the doctrine, the courts in this Circuit have generally been clear that the connection between the misconduct and the claim must be close."  *Id*.

Appellees' alleged misconduct is not related to the present matter.  Appellants argue that "the fraud perpetrated by the O'Briens upon the Bankruptcy Court . . . and abuse of Bankruptcy Court protections and proceedings are precisely the type of conduct that should bar Plaintiffs from seeking and receiving equitable relief from the very same Court upon which they perpetrated a fraud."  (Appellants' Br. at 36.)  However, Appellants themselves cite to a case which holds that in order for unclean hands to bar a party from obtaining an equitable remedy, the conduct must be related to "'the subject in issue.'" (Appellants' Br. at 34 (quoting *General Development Corp. v. Binstein*, 743 F.Supp. 1115, 1134 (D.N.J. 1990)).)  As the Bankruptcy Court rightly found, "that which transpired between the O'Briens, Rescuer #2, and this court during the O'Briens bankruptcy case is unrelated to the O'Brien/Cleveland transaction and the present adversary proceeding."  *O'Brien*, 423 B.R. at 492.

Moreover, "'[courts are] not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.'"  *Precision Instrument*, 324 U.S. at 815 (quoting *Keystone*, 290 U.S. at 245, 246).  "As an equitable doctrine, application of unclean hands rests within the sound discretion of the trial court."  *New Valley*, 181 F.3d at 525.  "In

bankruptcy proceedings, [the Third Circuit has] determined that an abuse of discretion exists when 'the [trial] court's decisions rests [*sic*] upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact.'" *Id*. at 522 (quoting *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 470 (3d Cir. 1998)).  The Bankruptcy Court did not abuse its discretion in refusing to allow Appellants to raise unclean hands as an equitable defense as it did not err in finding the doctrine inapplicable in the present proceedings.

> **v. The Bankruptcy Court did not err in finding in favor of Plaintiffs on their claims pursuant to TILA, HOEPA, and HOSA.**

The Court has already addressed Appellants' contention that the transaction at issue was not an equitable mortgage and therefore will not address this argument again.

> **a.  TILA and HOEPA claims.**

Appellants maintain that even if the transaction was an equitable mortgage, the Bankruptcy Court erred in its determination that Appellant Cleveland was a "creditor" as defined in TILA and HOEPA.  (Appellants' Br. at 38.)

A creditor is defined as

> a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement. . . . Any person who originates 2 or more mortgages referred to in subsection (aa) in any 12-month period or any person who originates 1 or more such mortgages through a mortgage broker shall be considered to be a creditor for purposes of this title . . . .

15 U.S.C. § 1602(f).  Subsection aa states:

> A mortgage referred to in this subsection means a consumer credit transaction that

> is secured by the consumer's personal dwelling . . . if– (A) the annual percentage rate at consummation of the transaction will exceed by more than 10 percentage points the yield on Treasury securities having comparable periods of maturity on the fifteenth day of the month immediately preceding the month in which the application for the extension of credit is received by the creditor; or (B) the total points and fees payable by the consumer at or before closing will exceed the greater of– (I) 8 percent of the total loan amount; or (ii) $400.

15 U.S.C. § 1602(aa).  "'Whether one is a TILA creditor is a bifurcated question, requiring a person both to be a 'creditor' in general, by extending credit in a certain minimum number of transactions, and to be the 'creditor' in the specific transaction in dispute.'"  *Pollice v. National Tax Funding, L.P.*, 225 F.3d 379, 411 (3d Cir. 2000) (quoting James Lockhart, Annotation, *Who is "Creditor" within Meaning of § 103(f) of Truth in Lending Act*, 157 A.L.R. Fed. 419, 443 (1999)).

Appellants maintain that the Bankruptcy Court "improperly made evidentiary findings and rendered a determination regarding the nature of a transaction not at issue before [it], and did so without the benefit of any testimony or evidence beyond selected documents from the separate and unrelated transaction" (Appellants' Br. at 40) and Appellants contend the Bankruptcy Court erred in relying on this information in determining that Appellant Cleveland was a creditor.  (*Id*.) As previously discussed, the Court reviews evidentiary rulings for abuse of discretion.  *See General Electric*, 522 U.S. at 141.  The Bankruptcy Court did not abuse its discretion in allowing and reviewing the evidence presented by Appellees at trial regarding a similar transaction entered into by Appellant Cleveland.  Specifically, the Bankruptcy Court considered the HUD-1 statement, deed, and leaseback agreement from a sale/leaseback transaction similar to the one involved in the present case between Appellant Cleveland and another borrower.  *See O'Brien*, 423 B.R. at 495.  Evidence is relevant when it has "any tendency to make the existence of any

19

fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  FED. R. EVID. 401.  However, "[a]lthough relevant, evidence may be excluded if its probative value is subtantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  FED. R. EVID. 403.  As the evidence at issue showed that Appellant Cleveland originated a second mortgage in the same twelve-month period, it was obviously relevant to the Bankruptcy Court's determination of whether Appellant Cleveland was a "creditor" according to 15 U.S.C. § 1602 (aa).  Moreover, it is not outweighed by other considerations.

Appellants further contend that the transaction at issue falls within a § 1602(aa) exception, claiming that the transaction, even if an equitable mortgage, is not governed by HOEPA because it is a "residential mortgage transaction[]."  (Appellants' Br. at 40-41.)  "The term 'residential mortgage transaction' means a transaction in which a mortgage, deed of trust, purchase money security interest arising under an installment sales contract, or equivalent consensual security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling."  15 U.S.C. § 1602(w).  Thus, Appellants' argument fails because the transaction between Appellants and Appellees was not a residential mortgage transaction as it was not intended to finance the acquisition or initial construction of Appellees' home.

The Bankruptcy Court did not err in determining that Appellant was a creditor in accordance with TILA and HOEPA.  It found that "the 'annual percentage rate at consummation' was approximately 20%," clearly exceeding "'by more than 10 percentage points the yield on

20

Treasury securities having comparable periods of maturity,'" which at the time were 4.75%. *O'Brien*, 423 B.R. at 495.  In addition, it found that "'the total points and fees payable by the consumer at or before loan closing' exceed the statutory maximum."  *Id*.  Moreover, as previously discussed, the Bankruptcy Court also found Appellant to fit the definition of creditor based on its finding of "sufficient evidence that Cleveland originated at least two mortgages of the type specified in [subsection aa]."  *Id*.  As Appellants only brief the issue of whether they were creditors for purposes of TILA and HOEPA, the Court, having found that the Bankruptcy Court did not err in this determination, does not consider the Bankruptcy Court's application of TILA and HOEPA to the present case.

### b.  HOSA.

Appellants argue that HOSA is inapplicable to the present transaction because Appellants are not predatory lenders, Appellees are sophisticated, and the transaction between the parties was not a home loan as defined by HOSA.  (Appellants' Br. at 43, 44.)  The Court finds Appellants' arguments unpersuasive and affirms the Bankruptcy Court's judgment.

Nowhere in HOSA is "predatory lender" defined.  Indeed, "[t]he term 'predatory lending' encompasses a variety of practices."  News Release, Board of Governors of the Federal Reserve System, Final Amendment to Regulation Z Regarding HOEPA and Predatory Lending (January 2002), *available at* 2002 WL 104480 (F.R.B.).  In enacting HOSA, the NJ State Legislature found that "[a]busive mortgage lending has become an increasing problem in this State, exacerbating the loss of equity in homes and causing an increase in the number of foreclosures in recent years."  N.J.S.A. § 46:10B-23(a).  HOSA was thus created to "address the problem of abusive mortgage lending in New Jersey in which a loan is equity-based not income-based." 29

N.J. Prac. § 2.5.  The transaction at issue in this case, which, as the Bankruptcy Court found and this Court affirmed, involved the use of unconscionable commercial practices, undoubtedly encompasses the type of predatory behavior envisioned by the NJ Legislature in enacting HOSA.

Moreover, the level of Appellees' sophistication is irrelevant; nowhere in HOSA is the parties' relative sophistication mentioned as a prerequisite for finding a violation.  Rather, the Legislative purpose for enacting HOSA indicates that the vulnerability of victimized communities, not their sophistication, was a primary factor in its enactment (*see* N.J.S.A. § 46:10B-23); here, the Bankruptcy Court thoroughly established Appellees' vulnerability. *See O'Brien* 423 B.R. at 484-85 ("The O'Briens are not typical victims. [] Mr. O'Brien understands the deal as slowly revealed to him by Mr. Cleveland. He agreed to the deal as explained because he had no other choice. [] It was either Mr. Cleveland's deal or the street.")

Furthermore, the transaction at issue is a home loan as defined by HOSA.  HOSA defines a home loan as

> an extension of credit primarily for personal, family or household purposes, including an open-end credit plan, other than a reverse mortgage transaction, in which the loan is secured by: (1) A mortgage or deed of trust on real estate in this State upon which there is located or there is to be located a one to six family dwelling which is or will be occupied by a borrower as the borrower's principal dwelling . . . .

N.J.S.A. § 46:10B-24.  Appellants argue "[e]ven if the transaction constituted an extension of credit, the transaction was <u>not</u> secured by a mortgage or deed or trust. The mortgage at issue was in the name of Cleveland only – no mortgage existed securing the alleged 'loan' to Plaintiff under which Plaintiffs would be liable."  (Appellants' Br. at 44; emphasis in original.)  In this case, Appellants issued Appellees what has been established as being, in actuality, an equitable

mortgage; it is thus irrelevant that the new mortgage was in Appellants' name.  Moreover, as contemplated by both parties, the mortgage secured by Appellant Cleveland was intended to satisfy Appellees' original debt; the mortgage itself was therefore the credit which was extended to Appellees.  *See O'Brien*, 423 B.R. at 484, 485.[8]

Appellants do not argue that the Bankruptcy Court erred in finding that they violated HOSA; rather, Appellants argue that the Bankruptcy Court "erroneously concluded as a matter of law that the transaction at issue qualified as a 'home loan' under HOSA [and thus] HOSA is inapplicable to the transaction between the parties."  (Appellants' Br. at 44.)  This Court, having affirmed the Bankruptcy Court's finding that HOSA is applicable as the transaction at issue was a home loan as defined by HOSA, does not find it necessary to review the Bankruptcy Court's specific findings regarding Appellants' specific HOSA violations.

### vi.  The Bankruptcy Court did not err in granting Plaintiffs an award of attorneys' fees.

Appellants contend that "the amount of fees awarded to Plaintiffs was excessive in light of the existing fee arrangement between Plaintiffs and their counsel."  (Appellants' Br. at 45.)  The Bankruptcy Court granted attorneys' fees in the amount of $33,932.50 for violation of the CFA, TILA, and HOSA.  (Final Judgment; Rec. on Appeal Item No. 11; Doc. No. 2.)  Appellants

---

[8] The Bankruptcy Court establishes this in its decision.  It quotes the written proposal originally submitted by Appellants to Appellees, which states "I am pleased to inform you that you have been pre-qualified for a mortgage solution loan in the amount of $540,000.00+ to secure your home from foreclosure.'"  *O'Brien*, 423 B.R. at 484.  At the time, Appellees needed approximately $510,000.00 to satisfy their debt.  *Id.* at 485.  Based upon this information, the Bankruptcy Court found: "What Mr. Cleveland did not explain, and what Mr. O'Brien did not anticipate, was that Cleveland would mortgage the property for $646,400, not merely the $510,000 needed to satisfy O'Briens' mortgages. . . . Mr. O'Brien assumed that his $5,000 monthly payment was servicing the financing."  *Id.*

argue that Appellees' counsel was paid a flat fee of $10,000.00, not on a contingent basis, and therefore the fee amount awarded by the Bankruptcy Court constitutes an enhanced fee award, which the Bankruptcy Court denied Appellees.  (Appellants' Br. at 45-46.)  The Bankruptcy Court considered this contention and noted that there was a discrepancy in Appellees' counsels' statements regarding fee calculation; however, the Bankruptcy Court did not find that Appellees' counsel was paid a flat fee.  (*See* Opinion at 7; Rec. on Appeal Item No. 12; Doc. No. 2.)

On appeal, an award of attorneys' fees is reviewed for abuse of discretion.  *See In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 555 F. 3d 768, 782 (3d. Cir. 1995).  "[A] reviewing court will disturb a trial court's award of counsel fees 'only on the rarest of occasions, and then only because of a clear abuse of discretion.'" *Litton Industries, Inc. v. IMO Industries, Inc.*, 200 N.J. 372, 386 (2009) (quoting *Packard-Bamberger & Co., Inc. v. Collier*, 167 N.J. 427, 444 (2001)).  The Court finds no abuse of discretion here.  The Bankruptcy Court reviewed Plaintiffs' attorneys' submission, calculated the lodestar, and considered factors set fort in New Jersey Rule of Professional Conduct 1.5 governing the determination of reasonable attorneys' fees.  (*See* Opinion at 5-6, Rec. on Appeal Item No. 12.)

## III.   CONCLUSION

For the foregoing reasons, the Court will AFFIRM the Bankruptcy Court's judgment.  In light of this decision, the Court will order this case CLOSED.  An appropriate form of order accompanies this memorandum opinion.

Dated: November 12, 2010

        /s/ Garrett E. Brown, Jr.
        GARRETT E. BROWN, JR., U.S.D.J.